**CCTW&M, a joint venture and Zimpro, Inc., Plaintiffs,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION II, Eckardt C. Beck, Regional Administrator of the United States Environmental Protection Agency, Region II, BSP Division of Envirotech Corporation and Passaic Valley Sewerage Commissioners, Defendants.**

Civ. A. No. 78–24.

United States District Court, D. New Jersey.

June 2, 1978.

Rosen, Gelman & Weiss, by William C. Slattery, Newark, N. J., for plaintiff CCTW&M.

Jones, Cuccio & Klinger, by Frank J. Cuccio, Hackensack, N. J., for plaintiff Zimpro, Inc.

Robert J. Del Tufo, U. S. Atty., by Carl R. Woodward, III, Asst. U. S. Atty., Newark, N. J., for defendant U. S.

Hannoch, Weisman, Stern & Besser, by Albert G. Besser, Newark, N. J., for defendant BSP Division of Envirotech Corp.

James V. Segreto, Haledon, N. J., for defendant Passaic Valley Sewerage Com'rs.

## OPINION

STERN, District Judge.

This is an action brought under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* to set aside an order of the Environmental Protection Agency. That order required that a grantee under Title II of the Federal Water Pollution Control Act

(FWPCA), 33 U.S.C. §§ 1281 (Supp.1977) *et seq.*, readvertise bids on a contract to construct part of a secondary waste water treatment facility. The order was issued because the Environmental Protection Agency (EPA) deemed unduly anti-competitive the bidding requirement that the system supplier possess a certain amount of experience or post a bond in lieu thereof. Plaintiff CCTW&M, the low bidder on the contract prior to the EPA order, joined by Zimpro, its systems supplier, claim that they would have been awarded the contract but for the agency action. They ask this Court to set aside the EPA order as arbitrary and capricious, essentially because the order constituted a reversal of the EPA's prior approval of the experience requirement.

The uncontested facts of record are as follows. On June 30, 1976, Region II of the EPA awarded to defendant Passaic Valley Sewerage Commission (PVSC)[1] a grant for the construction of a secondary waste water treatment facility. The estimated cost of the project is $387,788,929.00, of which 75%, or $290,841,697.00, is to be provided by EPA. The facility when completed is expected to have a daily capacity of approximately 300 million gallons. (Complaint, ¶¶ 3 and 4).

An essential part of the project is Contract 492, the subject of this lawsuit. That contract calls for the construction of a Thermal Sludge Conditioning System which is to employ a wet air oxidation process. At the outset, EPA was concerned that because of patents held by Zimpro, Zimpro would be the only potential supplier of the equipment called for in the specifications. Accordingly, early in 1976, at the request of EPA, PVSC agreed to employ non-proprietary specifications to encourage use of suppliers other than Zimpro. (Supp.Adm.Record, tab 1). This was achieved by permitting the systems supplier leeway in designing the process. (P's Exh. NN).

Because of the importance of the system and the discretion afforded the supplier, PVSC deemed it necessary that the supplier possess a requisite amount of experience or, in lieu thereof, that it post an experience bond. (Adm.Record, tab 18, encl. 3). In compliance with the EPA regulation governing experience clauses,[2] PVSC furnished a written justification for the experience bond, indicating that:

> It is felt to be essential because of the unique nature of the heat treatment process to be used. The high pressures and temperatures involved in the process require that the heat treatment equipment be provided by an experienced manufacturer in order to assure safe operation. It is our opinion that equipment or processes which have not been operated heretofore should be excluded. The equipment required for the thermal conditioning system is housed in a structure specifically designed to suit the system configuration. In the event of failure of the systems to perform, not only would it be necessary to replace or modify the equipment, but it might in addition be necessary to make major changes to the enclosing structure.

(Adm.Record, tab 4, encl. 2). Thereafter, the specifications for Contract 492, which included the experience requirement, were forwarded by PVSC for approval by EPA. By letter dated April 18, 1977, these specifications were approved by EPA's project engineer, Mark Savedoff. (Adm.Record, tab 4, encl. 3).

Following EPA's approval of the specifications, in July, 1977, defendant BSP Division of Envirotech Corporation (BSP), a competitor of Zimpro, protested with PVSC, arguing in essence that the specifications

---

1. PVSC, a public body organized pursuant to N.J.Stat.Ann. (West) 58:14–1 *et seq.* to eliminate pollution from the Passaic River, is required under the FWPCA to terminate ocean disposal of sludge by 1981. *See* 33 U.S.C. § 1412a(a) (Supp.1977).

2. 40 C.F.R. § 35.936–13(c) authorizes the use of experience clauses *provided* that the grantee furnish written justification and inexperienced suppliers are afforded the option of posting an experience bond so that they might bid on a project notwithstanding their lack of experience.

were necessarily proprietary to Zimpro, that is, that they had been drawn so that only Zimpro could qualify. (Adm.Record, tab 1).[3] On August 3, 1977, a conference was held at PVSC's offices. Among those present were Peter B. Devine, Regional Counsel to EPA Region II; Mr. Savedoff of EPA and representatives of PVSC, BSP and CCTW&M.[4] At the conference, the specifications were modified to meet most of BSP's objections. By letter dated August 16, 1977 to PVSC's engineer, Mr. Savedoff reiterated that the specifications had the EPA's approval. (Adm.Record, tab 4, encl. 1).

Thereafter, BSP focused its objections on the experience requirement and the form of the experience bond. This requirement, as ultimately promulgated, required that the supplier demonstrate that it had installed at least five similar processes over the past five years or that it post an experience bond guaranteeing the replacement of all parts of the system—with certain limited exceptions not relevant here—no matter what the cause of the failure for a period of five years.[5] BSP argued that the experience requirement had been drawn so that *only* Zimpro could qualify,[6] and that the bond alternative was not economically feasible. (Adm.Record, tab 1).

On September 2, 1977, PVSC held a formal protest hearing[7] (Adm.Record, tab 10, encl. 6), and ultimately denied BSP's protest. The opening of the bids was scheduled, after a number of adjournments, for September 8, 1977.

On September 6, 1977, BSP filed with the EPA an appeal from PVSC's denial of its protest, again focusing on the experience requirement and the form of the experience bond. At the same time, it instituted an action in the Superior Court of New Jersey, Chancery Division, to enjoin the opening of the bids. Under 40 C.F.R. § 35.939(h), filing an appeal with the EPA automatically defers for ten days "the protested procurement action." In addition, by letter dated September 8, 1977, Regional Director Eckardt Beck specifically requested PVSC not to open the bids until resolution of BSP's protest. (Adm.Record, tab 8). Nevertheless, on September 9, 1977, PVSC opened

3. Thus, for example, BSP argued that the pumps specified by the project were available only from Zimpro; that the specifications called for a system on which Zimpro held a patent and which would be made available to BSP only *upon payment of a $10 million royalty.* (Adm.Record, tab 1).

4. This conference was not transcribed. A rough summary of the conference is set forth in a memorandum from Robert Epstein to Albert Besser dated August 4, 1977. (P's Exh. A).

5. The experience requirement and bond alternative were worded as follows:

The supplier of the sludge thermal conditioning equipment shall submit through the contractor, satisfactory evidence to the engineer and owner of having furnished and installed satisfactorily operating systems of similar type, complexity and magnitude and containing similar equipment and materials in at least five (5) installations over the past five (5) years. In lieu of meeting this requirement, the proposed system supplier through the Contractor, shall furnish an approved Experience Bond to the Owner which shall guarantee the entire replacement by the system supplier of any and all parts of the system (including process, control system and process related equipment, but excluding the process air compressors, steam boilers, boiler feedwater equipment, CRT terminals, data display monitors, teleprinters and line printers) which fail over the period of five (5) years starting from the date of the successful completion of the guaranteed performance test . . . for the system. This Experience Bond shall be payable to the Owner, shall be of the form included in the Contract Documents, and shall cover all labor, equipment and materials required for replacement of failed parts and materials, except for those routinely consumed during normal operations . . . and except for equipment, parts and materials which have failed due to proven negligence on the part of the Owner's operating personnel. . . .

(P's Exh. K).

6. As noted *infra*, note 9, PVSC ultimately determined that not even Zimpro could meet the experience requirement.

7. EPA regulations provide for a two-tiered review of grant procurement actions. The protesting party must first protest with the grantee with an appeal thereafter to the Regional Administrator of the EPA. 40 C.F.R. § 35.939(d) and (e).

74

the bids.[8] Of the five contractors—all of whom named Zimpro as their systems supplier—CCTW&M's bid of $79,995,000 was the lowest.[9]

Subsequently, BSP's appeal was taken under consideration by EPA's Regional Counsel, Peter Devine. On November 9, 1977, he held a conference on the appeal, at which BSP, PVSC and the plaintiffs were represented. (Adm.Record, tab 24).

On December 10, 1977, acting on the recommendation of Regional Counsel Devine, Regional Administrator Beck issued a decision on BSP's appeal. In essence, he held that the form of the experience bond was so onerous, and the experience requirement so difficult to meet, that their inclusion in the specifications was anticompetitive and violative of the spirit of the EPA regulations. Accordingly, he directed that Contract 492 be rebid under specifications deleting these requirements. (Adm.Record, tab 27).

This lawsuit followed. On motion of the plaintiffs for summary judgment, we are asked to set aside the EPA order; on the government's motion for summary judgment, we are asked to enforce it.[10]

### Plaintiffs' Standing

On its motion to dismiss, BSP—although curiously enough EPA does not raise this in its own motion to dismiss—argues that plaintiffs lack standing to challenge the EPA's order because the possibility that they may be awarded the contract upon rebidding renders their present alleged injury too speculative.

■ The Administrative Procedure Act (APA), 5 U.S.C. § 702, authorizes judicial review of agency action at the instance of one adversely affected by such action:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof.

While this provision authorizes judicial review of agency action, a party bringing suit under the APA must still satisfy the constitutional and prudential prerequisites to standing. *See Ass'n of Data Processing Service Org. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ In *Data Processing* the Court, in finding that an association of data processing services had standing to challenge a determination by the Comptroller of Currency permitting National Banks to provide these services, articulated a two-prong test. First, in order to meet the threshold "case or controversy" requirement of Article III, plaintiffs must allege that the challenged action caused them "injury in fact, economic or otherwise." *Id.*, at 152, 90 S.Ct. at 829. Second, they must show that the interest which they seek to protect is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.*, at 153, 90 S.Ct. at 830. *See also, Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29, 33–34 (3rd Cir. 1976); *Davis v. Romney*, 490 F.2d 1360, 1363–1365 (3rd Cir. 1974).

Plaintiffs claim to meet the injury-in-fact prong of the *Data Processing* test on the grounds that (1) as low bidders on the contract they were "presumptively entitled" to the award [11] and (2) that their subsequent

8. There is some dispute as to the propriety of PVSC's actions. PVSC argues that it was under a statutory obligation, pursuant to N.J.Stat. Ann. (West) 2A:135–6, to open the bids as scheduled. EPA and BSP argue that PVSC was obligated to honor EPA's request that it defer the opening of the bids.

9. It was ultimately determined that Zimpro did not meet the experience requirement. Thus, after the bids were opened, CCTW&M obtained a consent of surety on behalf of Zimpro, indicating that the experience bond would be issued.

10. By way of cross-claim PVSC aligns itself with plaintiffs in seeking to have the order set aside; BSP aligns itself with the government seeking enforcement of the order.

11. Plaintiffs' claim of "presumptive entitlement" to the award of the contract rests on 40 C.F.R. § 35.938–4(h)(2), N.J.Stat.Ann. (West) 58:14–22, and N.J.Stat.Ann. (West) 40A:11–6.1 which provide, respectively, that the EPA, the PVSC commissioners and parties awarding public contracts shall award the contract to the lowest bidder.

chances of award upon rebidding are irreparably jeopardized because the amount of their bid has been disclosed.[12]

With respect to plaintiff CCTW&M, it seems clear that, under the law of this Circuit, it has alleged sufficient economic injury to entitle it to judicial relief. Under the so-called "disappointed bidder" doctrine, an unsuccessful bidder, that is, a bidder whose bid has been rejected, has standing to challenge the government action which caused its bid to be rejected. *See Merriam v. Kunzig,* 476 F.2d 1233 (3rd Cir.), *reh. den.,* 476 F.2d 1244, *cert. denied,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973); *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); Annot., *Standing of Unsuccessful Bidder for Federal Procurement Contract to Seek Judicial Review of Award,* 23 A.L.R.Fed. 301 (1975). This doctrine does not automatically bring CCTW&M into court, however, because its bid was not actually rejected; the challenged order merely requires that the bidding process be repeated. Thus, it is argued, CCTW&M's injury is only speculative at this point; it will have a second bite at the apple when the contract is rebid.

While it is true that CCTW&M's loss of the contract is merely speculative at this point, it is clear in this Circuit that the mere costs incurred in preparing the unsuccessful bid are sufficient injury on which to predicate a lawsuit to challenge government action. In *Merriam v. Kunzig, supra,* the court held that a landlord who had unsuccessfully bid on a twenty-year lease from the government had standing to challenge the grant of the lease to its competitor:

> In addition to the destruction of a present and future potentially profitable relationship with the Government . . . *Merriam also suffered loss of the costs incurred in preparing and in submitting his proposal.* . . .

476 F.2d at 1241 (emphasis supplied).

Thus, we conclude that the injury which CCTW&M alleges is sufficient for Article III purposes.[13] The next step under the *Data Processing* analysis is to determine whether CCTW&M is arguably within the zone of interests to be protected by the relevant statute, the FWPCA.

While it is obvious that the main interest sought to be protected is that of the public,[14] the statute, and particularly the regulations promulgated thereunder, clearly seek to protect the integrity of the bidding process. *See, e. g.,* 33 U.S.C. § 1284(a)(6) (proscribing proprietary specifications); 40 C.F.R. §§ 35.936–3 (expressing the EPA's policy to encourage "free and open" competition among bidders); 35.938–4 (requiring public bidding; award to lowest responsible bidder). Thus, we conclude that a bidder on a FWCPA contract is arguably within the zone of interests sought to be protected by the FWCPA.[15] *Cf. Merriam v. Kunzig,*

**12.** BSP argues that the Court should disregard this alleged injury because PVSC opened the bids in violation of EPA's request not to do so. While it may be that PVSC acted wrongfully in this respect, this consideration should not affect the Court's initial inquiry whether plaintiffs can meet the Article III requirement of injury in fact.

**13.** We find nothing to the contrary in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) or *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), two recent Supreme Court decisions on standing.

In *Warth v. Seldin,* the Court rejected as too speculative for Article III purposes the alleged injury suffered by low income plaintiffs who sought to challenge a zoning ordinance which precluded the construction of low income housing. In *Schlesinger,* the Court rejected plaintiffs' standing as citizens and taxpayers to challenge the membership of certain Congressmen in the Reserves. Here, by contrast, the injury is quite tangible.

**14.** While it is true that the statute authorizes citizen's suits against any state which fails to comply with the FWCPA, *see* 33 U.S.C. § 1365, the Court does not agree with BSP that the mere grant of standing to citizens precludes standing to other aggrieved parties.

**15.** This result is entirely consistent with *Sovereign Construction Co. v. City of Philadelphia,* 439 F.Supp. 692 (E.D.Pa.1977). That case held that no cause of action in favor of a disappointed bidder could be inferred from the FWCPA. Here, by contrast, we hold only that in a suit brought under the APA, a disappointed bidder

supra, at 1242–1243 (reading into Armed Service Procurement Act on intent to protect bidders).

■ Accordingly, the Court is satisfied that CCTW&M has standing to challenge the EPA's order. A different question arises as to plaintiff Zimpro, however. As a supplier, it did not itself submit a bid, and thus unlike CCTW&M it cannot invoke as injury in fact the costs of submitting a bid proposal.[16] We may assume, however, that Zimpro must have incurred costs in preparing the bid which it submitted to CCTW&M and that it stands to lose a considerable economic benefit as a result of the EPA order. Moreover, we note the recent decision in *Union Carbide v. Russell E. Train and Air Products and Chemicals, Inc.,* 73 F.R.D. 620 (S.D.N.Y.1977), which upheld the standing of a supplier who was not itself a bidder to challenge the award of a contract in which it was not named as a supplier. The court there rejected the contention that the "disappointed bidder" doctrine was limited to actual bidders, holding that a supplier may be sufficiently "aggrieved" to challenge the agency's action. It found support for this, and for the proposition that the supplier is within the "zone of interests" sought to be protected by the EPA's regulations, in the EPA's own regulations permitting protests to be filed by any party with an "adversely affected direct financial interest." [17]

Accordingly, the Court finds that Zimpro has standing to join CCTW&M in this lawsuit.

is "arguably within the zone of interests" sought to be protected by the FWCPA for purposes of *standing.*

16. The Complaint alleges that, while CCTW&M "expended substantial time, effort and money" in preparing the bid, Zimpro merely "submitted a bid price" to CCTW&M. (Complaint ¶ 11).

17. 40 C.F.R. § 35.939. While, of course, the EPA's regulations governing who may invoke its *own* grievance procedures are in no way binding on this Court in determining its own jurisdiction under Article III, it is interesting to note that the EPA found that BSP, a mere potential supplier, had a "direct financial inter-

*PVSC's Standing*

■ On motion of the EPA to dismiss PVSC's cross-claim, we are next asked to determine whether PVSC has standing to challenge the EPA's order under the APA.[18] Under *Merriam, supra,* PVSC has incurred tangible injury based on the costs of advertising the bids, costs which, by order of the EPA, it will now have to duplicate. So too, we believe that PVSC as a grantee is within the zone of interests sought to be protected by the FWCPA and the regulations promulgated thereunder. Indeed, it is one of the express purposes of the Act to protect the rights of state grantees vis-a-vis the federal government. *See* 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States . . . .") *See also,* 40 C.F.R. § 30.1115 (rights of grantee in disputes with EPA). Furthermore, it would be anomalous to hold that the party against whom an agency order is entered is without standing to challenge that order in a judicial proceeding. And, of course, PVSC has an interest in pursuing the requirement that suppliers possess a certain amount of experience.

Thus, we reject EPA's contention that PVSC lacks standing.[19]

*PVSC's Failure to Exhaust Administrative Remedies*

■ EPA further argues that PVSC's cross-claim should be dismissed for failure to exhaust administrative remedies.

The regulations provide that a grantee's dispute with the EPA is to be initially

est" and could thus protest PVSC's specifications.

18. By re-alleging in its cross-claim the allegations of the complaint, PVSC presumably bases its cross-claim in the APA.

19. We also reject EPA's contention that the matter is not ripe for adjudication. *Cf. M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 455 F.2d 1289, 1304 (1971) (noting that a disappointed bidder may not have an adequate remedy at law for recovery of anticipated profits).

presented to the designated agency officer, 40 C.F.R § 30.1100, with the right to an intra-agency appeal within thirty days of a decision. *Id.,* at § 30.1105. It is undisputed that PVSC did not invoke these procedures. However, it appears to this Court that this is an appropriate case in which to waive the exhaustion requirement. The agency action, following a bid protest which complied with the regulations, is clearly "final agency action." *Id.,* at § 35.939(e)(3). Thus, the basic purpose of the exhaustion requirement—deferral to agency expertise—has been fulfilled. *See United States ex rel. Marrero v. Warden, Lewisburg Penitentiary,* 483 F.2d 656 (3rd Cir. 1973) *rev'd on other grounds,* 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974); *Waddell v. Alldredge,* 480 F.2d 1078 (3rd Cir. 1973). Moreover, PVSC was a party to the bid protest proceedings and the EPA was made fully aware of its position at that time; indeed, it expressly rejected PVSC's contentions.

Accordingly, the Court holds that the objectives of the exhaustion requirement have been satisfied and, therefore, denies EPA's motion to dismiss PVSC's cross-claim.

### The Challenged EPA Order

■ We note at the outset that our review is limited in scope; we need only determine whether the EPA order was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", or "unsupported by substantial evidence . . .", 5 U.S.C. § 706. While the reviewing court is obligated to conduct a "searching and careful" inquiry into the record, "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). A particularly heavy burden rests on one who seeks to set aside the actions of procurement agencies; in such cases "[t]he court is

obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis." *M. Steinthal & Co. v. Seamans,* 147 U.S.App. D.C. 221, 233, 455 F.2d 1289, 1301 (1971) (footnote omitted).[20]

■ The EPA order is challenged both by plaintiffs and by PVSC. Plaintiffs argue that the order was arbitrary and capricious because, prior to the order, the EPA had at least twice approved the experience requirement. They further argue that the effect of the order was to deprive them of a contract to which they were "presumptively entitled."[21] PVSC argues that EPA's ruling with respect to the form of the experience bond impinges upon PVSC's statutory discretion under state law. Before reaching these arguments, we examine in greater detail the order of Regional Administrator Beck and the administrative record upon which it was based.

The EPA order followed the bid protest of BSP. The basis of that protest may be summarized as follows. The experience clause, in requiring five prior installations of similar "complexity" and "magnitude," was ambiguous; PVSC had refused to clarify this ambiguity; therefore BSP could not ascertain whether it would have to obtain a bond; and, finally, if no bidder could meet the experience requirement, then the required bond was no more than "a five-year mechanical warranty . . . under the guise of an experience bond." (Adm.Record, tab 7). BSP's protest was vigorously opposed by PVSC which argued to EPA that the experience clause had been justified in writing and that the form of the experience bond complied with that used generally in public contracts and, in any event, was a matter of state law. (Adm. Record, tab 10).

By decision and order dated December 10, 1977, Regional Administrator Beck ruled in favor of BSP. (Adm.Record, tab 27). Es-

---

**20.** Of course, as PVSC points out, it was PVSC, and not EPA, which acted as the "procurement agency" here. However, this does not alter the limited scope of review of agency orders which is mandated by the APA.

**21.** *See* note 11, *supra.*

sentially, he adopted BSP's argument that the combined effect of the experience bond—which could be met by no one—and the extensive coverage of the required bond alternative defeated the purpose of the experience requirement, operating:

> not [as] a method of insuring that experience [sic] manufacturers will be competing . . . [but] an extended five year warranty . . . which increases the construction bids to cover the bond premium to the total System replacement cost.

Addressing PVSC's argument that the form of the experience bond was a matter of state law, the Administrator stated that while PVSC might be correct "as a general proposition", "it is still within the interest of the EPA if the form of bond is so unusual or so onerous as to effectively preclude potential competitors who lack the requisite experience from obtaining the bond." Of the experience requirement itself, the Administrator indicated that it could not be used to coerce all bidders into providing a bond, that an experience requirement had to take into account the actual experience of at least some of the potential bidders:

> The experience requirement is "to protect the user from untried equipment." But the experience bond is a method of allowing untried equipment manufacturers to compete and, thereby, promote competition even at the risk of accepting an inexperienced manufacturer and previously untried equipment. It seems clear that the experience period cannot be ar-

rived at by ignoring the nature and extent of the possible competition.

(Footnote omitted). Accordingly, the Administrator directed that the contract be readvertised "after a careful review of the bidding documents in the light of this determination."

The Court, having conducted a thorough review of the administrative record along with the extensive submissions of the parties, concludes that the Administrator's decision is rational and supported by the record. It is obvious from the record that the goal of competitive bidding had not been achieved; Zimpro was named as the supplier in all five of the bids submitted to PVSC. And there is abundant evidence in the record that the experience bond was "onerous" and that BSP was unable to obtain a bond in the form mandated by PVSC.[22] Thus, given an experience requirement that was impossible to meet, it was rational to conclude that the bond "alternative" was not an alternative at all, and that the experience requirement served as·a way in which to coerce all bidders into furnishing an extensive warranty.[23] Clearly, the Administrator had a rational basis for concluding that the experience clause had been used in an improper manner and that the extensive coverage of the bond served to stifle competition.

 Nor do we believe that the Administrator acted contrary to law in reversing the EPA's earlier determination that the experience clause was valid and in compliance with EPA regulations.[24] The EPA's

---

**22.** For example, the administrative record contains a letter to BSP's insurance agent from its insurer, indicating that it would not furnish the bond:

> The bond guarantee goes far beyond the normal requirements of maintenance bond which usually covers only faulty workmanship and materials. . . .
> . . . [T]he basic fault of the guarantee itself would be self evident and I doubt seriously that any surety would agree to bond its terms.

Adm.Record, tab 10. *See also,* Adm.Record, tab 27, encl. 2 (deposition of Walter Young of Insurance Co. of North America).

**23.** Moreover, it appears from the record that experience requirements were disfavored by the EPA. Thus, a Program Guidance Memorandum directed to all EPA Administrators states that "[r]estrictive experience clauses in bid specifications are not allowable because they prevent the entrance of new firms and innovations into the bidding process." Adm. Record, tab 12, encl. 2. An earlier internal memorandum to all Regional Directors states that in wastewater treatment projects "it will be the practice of this program to discourage the general use of experience clauses." *Id.,* encl. 3.

**24.** We do not now decide whether the EPA may have to respond in damages for its elev-

own regulations contemplate periodic review of procurement methods;[25] hence, at least implicitly authorizing revisions in the contract specifications. While it is true that the order here reversed the EPA's earlier approval of the experience requirement, the public interest—here the interest in defraying the costs of federally-funded projects by promoting competition—requires that an agency be free to correct itself. In ordering modification of the specifications, the Regional Administrator acted in accordance with the policies of the EPA regulations favoring competition.[26]

Similarly, we are unpersuaded by plaintiffs' claim that the EPA order divested them of their "presumptive entitlement" to the contract.[27] Until actual acceptance of the contract, a bidder—even if he is the low bidder—has no vested interest in the contract, for the government has the absolute right to reject *all* bids. *Northland Equities v. Gateway Center Corp.,* 441 F.Supp. 259, 264 (E.D.Pa.1977). *See also, Keco Industries v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233, 1240 (1970).[28] And, of course, plaintiffs' cries are considerably muted when one considers that they were parties to the protest proceedings, fully on notice that the bids might have to be recast because of the protest of its competitor lodged before the bids were opened. In any event, while it is unfortunate that plaintiffs relied to their detriment on the EPA's prior

approval of the experience requirement, we cannot say that CCTW&M's interest in being awarded the contract outweighs the public interest in decreasing the costs of federally-financed projects. CCTW&M may, or may not, be entitled to recoup the cost of preparing its bid based on EPA's change of heart, but it is not entitled to the contract.

So too, the Court finds without merit PVSC's argument that the form of the experience bond rests solely within PVSC's discretion.[29] While PVSC has a strong interest in ensuring the competence of contractors who work on its projects, surely the EPA—which is financing 75% of the cost of the project—has a stronger interest in eliminating a requirement which is anti-competitive. In any event, even if it could be said that the EPA ruling directly contravenes the statutory authority vested in PVSC by the State of New Jersey, it is clear that federal law and federal policies must prevail.

Accordingly, summary judgment is granted in favor of the government.

---

enth-hour reversal of its approval of the contract specifications. *See Merriam v. Kunzig, supra,* at 1241; *M. Steinthal v. Seamans,* 147 U.S.App.D.C. 221, 224, 455 F.2d 1289, 1302 (1971).

25. 40 C.F.R. § 35.935–2 provides that "[t]he Regional Administrator will cause appropriate review of grantee procurement methods to be made from time to time."

26. *See, e. g.,* 40 C.F.R. § 35.936–3 ("[i]t is the policy of the Environmental Protection Agency to encourage free and open competition"); 33 U.S.C. § 1284(a)(6) and 40 C.F.R. § 35.936–13(a) (mandating nonproprietary specifications).

27. It is obvious that the purpose of those statutes, *see* note 11, *supra,* mandating award to the lowest bidder is not to confer rights upon a

bidder, but to safeguard the public interest in the integrity of the bidding process.

So too, it is clear that 33 U.S.C. § 1283(a) providing that the Administrator's approval of the specifications "shall be deemed a contractual obligation of the United States for the payment of its proportional contribution of such project" confers no rights on a bidder, but rather guarantees payment to the grantee.

28. Indeed, the EPA's regulations give the grantee the opportunity to reserve the right to reject all bids. 40 C.F.R. § 39.938–4(h)(2).

29. The statutes upon which PVSC relies are N.J.Stat.Ann. (West) 58:14–22 which provides that PVSC Commissioners shall have the right to require contractors "to give bond satisfactory in amount and security", and *Id.* 2A:44–147 from which it claims to have derived the form of its bond.