BSP DIVISION OF ENVIROTECH
CORPORATION, Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Region II,
Eckardt C. Beck, Regional Administrator, Turner Construction Co., Zimpro,
Inc., and Passaic Valley Sewerage Commissioners, Defendants.

Civ. A. No. 78–2566.

United States District Court,
D. New Jersey.

June 1, 1979.

As Amended June 11, 1979.

Hannoch, Weisman, Stern & Besser, P.A. by Albert G. Besser, Robert C. Epstein, Newark, N.J., for plaintiff.

Robert J. Del Tufo, U.S. Atty. by Lee R. Tyner, Sp. Asst. U.S. Atty., Newark, N.J., Peter B. Devine, Regional Counsel, Region II, Environmental Protection Agency, New York City, Christopher L. Rissetto, Environmental Protection Agency, Washington, D.C., for defendants United States Environmental Protection Agency, Region II, and Eckardt C. Beck, Regional Administrator.

Rosen, Gelman & Weiss by William C. Slattery, Newark, N.J., for defendant Turner Construction Co.

Jones & Cuccio by Frank J. Cuccio, Hackensack, N.J., Jones, Day, Reavis & Pogue, Washington, D.C., for defendant Zimpro, Inc. •

James V. Segreto, Haledon, N.J., for defendant Passaic Valley Sewerage Commissioners.

## OPINION

STERN, District Judge.

Plaintiff, BSP, a prospective supplier of part of an EPA-funded waste water treatment facility, brings suit under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, to set aside a decision of the Environmental Protection Agency (EPA) dismissing BSP's bid protest on procedural grounds.[1] BSP claimed in its bid protest that the contract specifications were anticompetitive because they called for equipment which was proprietary to BSP's competitor Zimpro, Inc.[2] Rather than ruling on the merits of this claim, the EPA dismissed the bid protest as untimely and held further that BSP was estopped in its protest because it had earlier raised and then abandoned the same claim. We uphold the decision of the EPA and grant summary judgment in favor of the defendants.

The Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (FWPCA) provides for the cessation of ocean disposal of sewage sludge no later than December 31, 1981.[3] 33 U.S.C. § 1412a(a). The Act further authorizes the EPA to award grants to any public agency to cover 75% of the cost of constructing waste treatment facilities which *inter alia* provide for alternative ways to dispose of sludge.[4] 33 U.S.C. § 1281 *et seq.* On June 30, 1976, the EPA awarded the Passaic Valley Sewerage Commission (PVSC)[5] $290,841,697.00 or 75% of the total cost of constructing a secondary

---

**1.** *CCTW&M v. EPA*, 452 F.Supp. 69 (D.N.J. 1978), decided by this Court one year ago, involved the same contract and the same parties. That case was also the culmination of a bid protest initiated by BSP, in which it successfully argued to the EPA that one of the specifications was anti-competitive. The EPA ordered the rebidding which is the subject of this action.

The *CCTW&M* action is discussed in greater detail *infra*.

**2.** Neither BSP nor Zimpro are actual *bidders* on the contract, but are suppliers. However, the EPA regulations give them standing as parties with "a direct financial interest" to protest bid specifications. 40 C.F.R. § 35.939(a). This Court has previously upheld Zimpro's standing for Article III purposes to contest a decision of the EPA. *See CCTW&M v. EPA, supra*, at 76.

**3.** "Sewage sludge" is the waste generated by waste water treatment plants. 33 U.S.C. § 1412a(b).

**4.** The FWPCA seeks to encourage the construction of waste water treatment plants which provide for the recycling of pollutants that can be recycled; the disposal of pollutants that cannot be recycled; the reclamation of waste water; and the elimination of the resulting sludge "in a manner that will not result in environmental hazards." 33 U.S.C. § 1281(d).

**5.** PVSC is a municipal corporation charged under state law with eliminating pollution from the streams and rivers within the boundaries of the Passaic Valley Sewerage District. *See* N.J. S.A. 58:14–1 *et seq.*

waste water treatment facility on the Passaic River.[6]

An essential part of this facility is the Thermal Sludge Conditioning System which is designed to treat sludge with heat and pressure. Pursuant to the FWPCA, see 33 U.S.C. § 1283(a), PVSC submitted specifications for this system for the EPA's approval. The EPA expressed concern that the treatment process called for in the specifications was proprietary to Zimpro and therefore uncompetitive, and it ordered substantial revision of the specifications. (Adm.Rec. tab 2). In exchange, however, the specifications required that the supplier of the system have five years prior experience or, in lieu thereof, that it post an experience bond. The EPA approved the specifications on April 19, 1977. *CCTW&M v. EPA, supra*, at 71–74

### BSP's 1977 Protest and the CCTW&M Action

In July 1977, following the EPA's approval of the contract specifications, BSP lodged a bid protest with PVSC,[7] arguing that the contract specifications, although revised, were still proprietary to Zimpro. Specifically, BSP argued that (1) the process contemplated by the specifications was patented by Zimpro, (2) the high-pressure pumps required by the specifications are manufactured and sold only by Zimpro, and (3) the experience requirement was drawn so that only Zimpro could qualify. (Adm.Rec. tab 4). In August 1977, BSP met with representatives of PVSC and the contract specifications were again revised.[8] Apparently, BSP was satisfied that the specifications were no longer proprietary for it immediately abandoned this claim. (Exh. P–R).

Thereafter, BSP still pressed its protest—but on other grounds. It focused *solely* upon the experience requirement and the bond alternative. BSP argued that only Zimpro possessed the requisite experience and that the bond alternative was so onerous that it was not in fact an alternative at all. BSP claimed that the combined effect of these requirements was to stifle competition to the benefit of Zimpro. (Exh. P–R; Adm.Rec. tab 10).

On September 2, 1977, PVSC denied BSP's protest (Adm.Rec. tab 14), and BSP immediately sought review with the EPA. (Adm.Rec. tab 15). In the meantime, however, bids were submitted and, on September 9, 1977, PVSC opened them. Of the five bids—all of which named Zimpro as the supplier—the bid of CCTW&M was the lowest.[9] *CCTW&M v. EPA, supra*, at 73–74.

On December 10, 1977, the EPA issued a written decision, substantially agreeing with BSP that the experience requirement and bond alternative were anti-competitive. It ordered PVSC to revise the specifications and readvertise the contract. *Id.*

CCTW&M and Zimpro thereafter sought judicial review of the EPA's decision. This Court found that the decision had a rational basis and awarded summary judgment to the EPA. *See CCTW&M v. EPA*, 452 F.Supp. 69 (D.N.J.1978).

The specifications were thereafter revised and bidding began anew.

### BSP's 1978 Protest and the Present Action

The revised specifications were readvertised on July 26, 1978. Bids were submitted on August 30, 1978. They were as follows:

---

6. The then-estimated cost of the project was $387,788,929.00. The remaining 25% was to be provided by PVSC.

7. EPA regulations provide that a bid protest be initially filed with the grantee with an appeal thereafter to the EPA. 40 C.F.R. § 35.939.

8. The specifications were revised to provide that PVSC would not utilize the low-pressure wet-air oxidation process until expiration of Zimpro's patent. (Exh. O–Q).

9. Turner Construction Co., the successful bidder and a defendant herein, was a partner in CCTW&M, a joint venture, which apparently has been dissolved.

| PRIME CONTRACT | SUPPLIER | AMOUNT OF BID |
|---|---|---|
| Turner Construction Co. | Zimpro, Inc. | $79,162,000 |
| Vicon Construction Co. | Zimpro, Inc. | 81,700,000 |
| Terminal Construction Co. | BSP | 83,886,000 |

The contract was awarded to Turner Construction Co., the low bidder. (Exh. I, J).

During the pendency of the bidding, on August 22, 1978, BSP again lodged a protest with PVSC. Its protests this time were two-fold. (Adm.Rec. tab 33). First, it renewed the objection it had pressed, but then abandoned, in its 1977 protest; that the high-pressure pump called for in the specifications was proprietary to Zimpro. Second, it objected to "SP–13", the specific warranty and bond requirements which replaced the experience bond.[10]

Following PVSC's denial of BSP's protest, on August 28, 1978, BSP protested with the EPA. (Adm.Rec. tab 38). The Regional Administrator rendered his decision on October 5, 1978. (Exh. A). He ruled as follows.

First, with respect to BSP's objections to the pump specifications, the Regional Administrator held that BSP was estopped by its withdrawal of this same objection during the 1977 protest:

> It is . . . clear that BSP's current protest is based upon the very same argument as that which underlay its protest of July 1, 1977 and which it withdrew in the course of pursuing its prior protest on other grounds. The [pump specification] was not changed in any way . . .

from August 1977 to August 1978. . . .
> In view of these facts, the protester should be estopped from raising an objection, withdrawing it . . . and then, upon readvertisement, renewing the same protest issue at a point well into the new bidding period.

(Exh. A at 4–5).

Second, he ruled that BSP's protest was untimely:

> The readvertisement was issued on July 26, 1978. It is reasonable to assume that very shortly thereafter BSP was aware of the re-use of the exact wording of [the pump specification] and knew the basis of its protest (the same basis as for its 1977 pump protest). BSP did not file its protest until August 22, 1978, eight days before the scheduled bid opening and 27 days after readvertisement. Although by itself, this need not be determinative of the timeliness issue, taken together with prior procurement events, it shows that BSP did not come forward with its objections as expeditiously as possible, especially in light of the common knowledge . . . of the crucial nature of the Grantee's ocean dumping permit obligation. . . .

(*Id.*). Accordingly, he dismissed BSP's protest under 40 C.F.R. § 35.939(f)(7) ("a protest may be dismissed for failure to comply with procedural requirements.").[11] He then went on to make some general observations regarding the specifications.[12]

With respect to the pump specifications, the Regional Administrator noted that

---

10. BSP challenged that portion of the warranty which required the contractor to warrant that the system "will be free of defects and deficiencies in design, manufacture and installation." BSP argued that this warranty was objectionable because (1) much of the design was actually done by PVSC, and (2) it required the warranting of so-called "buy-out products", *i. e.*, items obtained from other manufacturers. BSP also objected to the warranty requiring the contractor to "repair, modify or replace" the system. It argued that this warranty (1) failed to specify its operative period, and (2) could possibly be construed as an absolute performance guarantee requiring the contractor to replace a part which failed regardless of the cause of the

failure. In addition, BSP claimed that these warranties constituted a use of federal funds in violation of 33 U.S.C. § 1251 which authorizes federal grants for the *construction*, not the *maintenance*, of sewage facilities.

11. 40 C.F.R. § 35.939(b)(1) provides that a protest must be made as early as possible during the procurement process and, in any event, must be received by the grantee within one week after the basis for the protest is known.

12. He did so pursuant to 40 C.F.R. § 35.935–2 and § 35.939(f)(6), which permit the Regional Administrator to review *sua sponte* a grantee's procurement practices. (Exh. A at 6).

"[t]he Grantee used verbatim a significant portion of the Zimpro diagram pump specification . . . which may have been tantamount to a single brand name, sole source specification." (Exh. A at 6). He noted that the grantee should have sought to determine before soliciting bids whether Zimpro was the only viable source of pumps and, if so, should have sought to justify a sole source designation.[13] Had there been other possible sources, the specifications should have used an "or equal" or two brand name specification.[14] (*Id.*). He concluded, however, that there was no prejudice to BSP because Zimpro's diaphragm pump was the only acceptable source. (*Id.*, at 7–11).

The Regional Administrator also addressed SP–13, the warranty specification. Of BSP's objection that the warranty of design might be interpreted to require the contractor to warrant that which PVSC had designed, he noted that PVSC had already rejected this interpretation of the warranty. (*Id.* at 14). Of BSP's objection that the warranty necessarily extended to "buy-out items"—items purchased from third parties—he concluded that this requirement was perfectly rational because "[t]he grantee's concern was with the operation and reliability of the entire system, including parts purchased from others." (*Id.*). The Regional Administrator further observed that PVSC was presently under no obligation to clarify the alleged ambiguity of the obligation to "repair, modify or replace", because it placed BSP at no competitive disadvantage. (*Id.*, at 15). Finally, he

**13.** EPA regulations prohibit the use of equipment or processes known to be available from only one source, unless justification is furnished by the grantee's engineer. 40 C.F.R. § 35.936–13(b).

**14.** EPA regulations provide that specifications may not be written in a proprietary manner except where necessary for descriptive or other purposes. In that event, the specifications must utilize at least two brand names and be followed by the phrase "or equal". 40 C.F.R. § 35.936–13(a).

**15.** BSP argues that a federal statute is implicated and, therefore, that our review should not be so narrowly constructed. BSP relies upon the

held that BSP was without standing to raise the argument (*see* note 10, *supra*) that the warranty was ineligible for federal funding under 33 U.S.C. § 1251. (*Id.*, at 16–18).

■ This lawsuit seeks to set aside the decision of the EPA. On motion of all parties for summary judgment we must determine whether that decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", 5 U.S.C. § 706(2)(A), and must be set aside; or whether it rests on a rational basis, and therefore must stand. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[15]

### The EPA Decision

#### Timeliness

■ The specifications were readvertised on July 26, 1978. However, it was not until August 22, 1978 that BSP filed its protest with PVSC. The regulations make clear that a protest must be received by the grantee "within one week after the basis for the protest is known or should have been known." 40 C.F.R. § 35.939(b)(1). In view of the informal manner in which a bid protest may be made, there is nothing onerous about this time limitation.[16] Indeed, this one week protest provision has been upheld by at least two courts. *See New Ikor, Inc. v. A. S. McGlennon*, 446 F.Supp. 136 (D.Mass.1978); *Maclean Construction Co. v. EPA*, 432 F.Supp. 242 (W.D.Mich. 1976).

FWPCA, which at 33 U.S.C. § 1284(a)(6), provides that FWPCA funded projects shall not contain "proprietary, exclusionary, or discriminatory . . ." specifications.

It is clear, however, that BSP cannot alter this Court's limited review of the EPA's action merely by invoking the FWPCA. If the EPA decision is contrary to the Act we will, of course, set it aside; short of that, we need only ascertain its rationality.

**16.** 40 C.F.R. § 35.939(b)(3) permits "[i]nitiation of bid protests . . . by brief telegraphic notice accompanied by simultaneous mailing . . . of a more detailed statement of the basis for the protest."

The EPA's decision dismissing BSP's protest was therefore consistent with EPA's own regulations. We find nothing irrational in this basis for decision, particularly in light of the stringent time exigencies mandated by the FWPCA.

*Estoppel*

The EPA held that BSP was estopped from protesting the pump specifications because of BSP's withdrawal of this objection during its 1977 protest. BSP argues that there is no precedent for application of the doctrine of estoppel to a bidder during a protest proceeding, and that the Regional Administrator erred in failing to address the legal principles underlying the estoppel doctrine.

Again, the Regional Administrator's ruling is reasonable and grounded in sound policy considerations. We need not address the technicalities of the estoppel rule; it is enough to note that the EPA and PVSC had a right to rely upon BSP's previous abandonment of the pump protest. BSP could have pressed this objection a year earlier; it simply cannot withdraw it, only to renew it as a last-ditch attempt in the eleventh hour. Application of estoppel here, like the requirement of timeliness, recognizes that litigation of public contracts must come to an end. We find no error in its application.

*The "Merits"*

Because the EPA based its decision on timeliness and estoppel, the so-called "merits" of the EPA's decision are not properly before this Court. *See New Ikor, Inc. v. McGlennon, supra,* at 138. Nevertheless, BSP argues that the EPA "ruled" in its favor on the "merits" and, was therefore, in error in dismissing BSP's protest on procedural grounds. We need only briefly comment on the "merits" of the EPA decision.

The Regional Administrator recognized that the specifications could have been drawn in a less proprietary manner. But he also recognized—in an area within *his* expertise—that Zimpro was the only viable source for the pump and therefore that there had been no competitive prejudice. This Court will not second-guess that determination.[17]

The EPA's conclusions with respect to the warranty requirements are reasonable on their face and require no discussion. Clearly, this is a matter within EPA's expertise.

Finally, BSP takes issue with the EPA's conclusion that BSP lacks standing to challenge the possible violation of 33 U.S.C. § 1251 which limits EPA grants to "construction" rather than "operation and maintenance" of sewage facilities. This conclusion clearly had its basis in EPA regulations which limit bid protests to "alleged violation of the procurement requirements" set forth in the regulations and then only by a party with an "adversely affected direct financial interest." 40 C.F.R. § 35.939(a). Clearly, the EPA has a right to limit the scope of bid protests, just as it has an interest in resolving those protests as expeditiously as possible.

Thus, even though the "merits" of the EPA decision are not properly before the Court, it is clear that the EPA would not have found them to be favorable to BSP. In any event, the Court finds that the dismissal of BSP's protest on the grounds of estoppel and untimeliness has a rational basis and that the EPA did not err in failing to rule on the merits.

Accordingly, summary judgment will be granted in favor of the defendants.

---

**17.** BSP argues that the EPA erred in refusing to address 33 U.S.C. § 1284(a)(6) which proscribes proprietary specifications. While the EPA did not specifically cite the statute, it clearly addressed its requirements. Moreover, the EPA did cite the regulation (40 C.F.R. § 35.936–13) whose language is almost identical to the statute.