PASSAVANT CORPORATION, the Hyman and Fannie Besser Foundation, and Albert G. Besser, as Executor of the Estate of Hyman Besser, Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION II, Eckardt C. Beck, Regional Administrator, Passaic Valley Sewerage Commission, Courter & Company, and Performance Systems, Inc., Defendants.

Civ. No. 79–1383.

United States District Court,
D. New Jersey.

Oct. 2, 1979.

Robert C. Epstein, Hannoch, Weisman, Stern & Besser, P. A., Newark, N. J., for plaintiffs.

James V. Segreto, Segreto & Segreto, Haledon, N. J., for defendant Passaic Valley Sewerage Commission.

Alfred J. Kovell, Wood Ridge, N. J., for defendant Performance Systems, Inc.

Robert C. Benisch, Berman, Paley, Goldstein & Berman, New York City, for defendant Courter & Co.

Lee R. Tyner, Sp. Asst. U. S. Atty., Robert J. Del Tufo, U. S. Atty., Newark, N. J., for federal defendant.

BIUNNO, District Judge.

Passaic Valley Sewerage Commission (PSVC) is an agency of the State of New Jersey, performing public functions, *Brickett v. Lagay,* 134 N.J.L. 1, 45 A.2d 804 (E. & A., 1946). The District was created by N.J. P.L. 1902, c. 48, and the applicable statutes are found in N.J.S.A. 58:14–1, et seq. Its territorial boundaries encompass those parts of Essex, Passaic, Bergen and Hudson counties described by metes and bounds in N.J. S.A. 58:14–1 and 1.1, and its general purpose is to relieve the streams and rivers in the District from pollution. By P.L.1953, c. 388, now found in N.J.S.A. 58:14–34.10 et seq. a legislative finding was made of an imperative need to repair, replace and improve the sewerage system, including particularly immediate enlargement and betterment of the sewage treatment and disposal works.

The present dispute deals with the type of specifications employed by PVSC to advertise for bids on a sludge dewatering plant, under Contract 500A. As the court understands it, the dewatering of sludge is one of the last processes of the various stages of sewage treatment, and is intended to separate solids from liquid effluent so that the solids may be disposed of other than by dumping sludge in the ocean, a method which Congress has declared may not be used after December 31, 1981.

The dewatering process evidently follows the heat treatment stage, which was involved in *CCTW & M v. EPA,* 452 F.Supp. 69 (D.N.J.1978) and *BSP v. EPA,* 471 F.Supp. 958 (D.N.J.1979).

The entire treatment plant project, of which the heat-treatment and dewatering stages are a part, is evidently the subject of a grant under 33 U.S.C. § 1281, et seq., under which the Federal share is 75%, 33 U.S.C. § 1282(a)(1), the grants being administered by the Environmental Protection Agency (EPA).

Plaintiff Passavant is a manufacturer of high pressure filter presses for the dewatering of sludge. Passavant did not submit a bid, nor did any contractor submit a bid contemplating the use of Passavant's equipment.

Instead, after having received the bid documents on December 12, 1978 (Adm. Rec., Tab 3, p. 22), Passavant wrote PVSC on December 19, 1978 claiming that insufficient time had been allowed to submit bids (Idem., p. 21). Then, on February 2, 1979, Passavant wrote the Consulting Engineers, with copy to PVSC and EPA, requesting a change of specifications and asking a reply by February 9, 1979 (Idem., Tab 2, item 5), and on February 9, 1979 wrote a bid protest directed to the specifications to PVSC (Idem., Tab 2, item 6). Since February 9 was a Friday and Monday, February 12 was a holiday, the bid protest was received by PVSC on February 13, 1979 (Idem., Tab 3, p. 10, Consent Exhibit 1).

On February 15, 1979, PVSC wrote Passavant to acknowledge the protest and set a hearing date for February 27, 1979 (Idem., Tab 2, item 7), a date which was changed to March 13, 1979 by letter of February 23, 1979 (Idem., Tab 2, item 8).

In the bid protest letter and at the hearing, Passavant objected to the use of "performance" specifications under which bids could be submitted with the use of 6 different makes of filter presses: two each of the high pressure, low pressure and diaphragm type, employing not less than 5 or more than 10 units (Idem., Tab 3, p. 40, p. 41, pp. 85–86, pp. 106–107). It objected to the requirement that each bidder provide dimensions for the building (to be let under Contract 500B) to house the equipment (Idem., Tab 3, pp. 59–61; pp. 108–115), to the use of a test run when the equipment was install-

ed and the performance bond to assure that the process would function as designed (Idem., Tab 3, pp. 61–67).

Other objections made, such that the performance bond required would increase the bid price by the face amount of the bond, and would amount to charging operating and maintenance costs to capital or construction costs, are collateral.

In any event, after the hearing before PVSC on March 13, 1979, a Report and Recommendation by the Hearing Officer was made (Idem., Tab 2, item 2) accompanied by an engineering report (Idem., Tab 2, item 3) and a legal opinion (Idem., Tab 2, item 4), these being dated March 14, 1979. Under date of March 16, 1979, Passavant submitted a request for review of the determination of PVSC rejecting the protest (Idem., Tab 2, item 1).

The Memorandum of Authorities submitted to PVSC was sent to EPA with Passavant's letter of March 22, 1979 (Idem., Tab 4). EPA's Regional Counsel wrote PVSC on March 26, 1979 (Idem., Tab 5) that further procurement action be deferred until final resolution by EPA, inviting further written submissions by April 6th, and scheduling a conference for April 10th. An extension of the submission deadline is reflected by Passavant's letter of March 30th to PVSC (Idem., Tab 6), and Passavant's further submission and letter of transmittal was made April 7th (Idem., Tab 7). A list of those who appeared at the conference of April 10th is found at Tab 8, and the Regional Administrator's determination rejecting the protest and authorizing approval of the award of the contract to the low bidder was issued April 13th (Idem., Tab 9).

The complaint here was filed May 4, 1979 on behalf of Passavant and two parties (hereafter "Besser") claiming to own vacant land within the District. Aside from introductory matter, the complaint criticizes the "performance" method of specification (Part II), the allowance of 3 different generic types of dewatering systems (Part III), the use of "average pressure" as a component for calculating the theoretical capacity of the dewatering system (Part IV), the performance guarantee (Part V), and the alleged use of federal grant funds for "operation and maintenance costs" (Part VI).

The remedies sought are: (A) declaring the EPA decision to be unlawful and setting it aside; (B) preliminary and permanent injunction against PVSC from awarding the contract or, if already granted, setting it aside; (C) preliminary and injunctive relief against PVSC from promulgating or adhering to the specifications and requiring it to change them in such fashion as the Court finds fair and proper; (D) enjoining the low bidder and its supplier of equipment from commencing work on the project, and (E) other and further relief.

On the same day, an order to show cause was entered ex parte directing defendants to show cause why EPA should not be directed to serve and file the certified Administrative Record.

PVSC filed its answer May 21, 1979, denying the crucial allegations and raising separate defenses. A certified index of the Administrative Record was filed May 21, 1979 (and a copy was provided). Defendant Performance Systems, Inc. (manufacturer of the equipment to be supplied by the low bidder) filed June 11, 1979. It, too, denied the crucial allegations, asserted affirmative defenses, and asserted a counterclaim seeking that plaintiffs be required to post a bond and seeking damages for delay. Plaintiffs filed answer to the counterclaim on June 28, 1979.

EPA and its Regional Administrator filed a motion for summary judgment on July 3, 1978. Plaintiffs filed a cross-motion for summary judgment on August 17, 1979 and PVSC also filed a motion for summary judgment on August 22, 1979. All three motions were heard September 10, 1979.

■ The scope of review here is narrow and limited. No matter how thorough and detailed the review may be, it may not go so far as to authorize substitution of the court's judgment for that of the agency. *Citizens etc., v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The test is

whether the challenger has established that there was no rational basis for the agency determination. See *Sea-Land, Inc. v. Brown,* 600 F.2d 429 (CA 3, 1979); *CCTW & M v. EPA,* 452 F.Supp. 69 (D.N.J.1978); *M. Steinthal & Co. v. Seamans,* 147 U.S.App. D.C. 221, 455 F.2d 1289 (C.A.D.C.1971).

■ Obviously, the challenger has the burden at all the stages: at the bid protest hearing before PVSC, at the review before the EPA Regional Administrator, and in this court.

After careful review of all the papers in the case, and consideration of the oral argument on the cross-motions, the court concludes that Passavant has fallen far short of the requisite showing, and that the motions against it should be granted while its motion should be denied, thus affirming the administrative decision.

Passavant argues that the testimony of its President, Mr. Norman J. Blais, at the PVSC hearing (Adm.Record, Tab 3) was "uncontroverted". What this means is that he was the only witness to testify before PVSC, but the fact that no other witness testified hardly warrants the ipse dixit conclusion that Passavant carried its burden.

Blais testified as an expert witness and expressed a number of opinions. However, the opinions were not supported by underlying fact and a disclosure of the rationale leading from fact to opinion. Under those circumstances, it cannot be said that either PVSC or EPA was obliged to accept his conclusions.

In fact, read as a whole, the Blais testimony displays at best a difference of philosophy, a difference of policy and of judgment. But these are matters for the administrative agencies, not for non-bidders or for the court.

The philosophical difference centers on the use of performance specifications rather than on equipment specifications. It is plain from the Blais testimony itself that more than one generic type of filter equipment can do the dewatering job. From among the entire array, PVSC allowed the use of either high pressure, low pressure or diaphragm filter presses to be used for the bids. It specified the volume of sludge to be treated daily in terms of capacity and the degree of dewatering to be achieved. The court sees nothing irrational about this kind of specification. It is no different in nature than the common provision in publicly bid contracts for construction of a building to leave "means and methods" to the contractor so long as the completed structure can be accepted within the framework of what is called for.

PVSC was obviously seeking bids based on any of the three kinds of process allowed, that would achieve the desired result. In this sense the equipment is necessarily tied to the process. For the needed purpose of dewatering sludge, which can be expected to flow in at huge daily volumes and which must be disposed of, it is entirely rational to specify how the dewatering stage process is to perform, as tested by its productive output, rather than to select one or another process, detail the associated equipment, and seek bids in a context where the likelihood would be that only the equipment of a single manufacturer would qualify.

The experience with that kind of specification and bidding is well illustrated by the recorded history in connection with the heat-treatment stage, whose output supplies the dewatering process. See *CCTW & M v. EPA,* 452 F.Supp. 69 (D.N.J.1978) and *BSP v. EPA,* Civ.No. 78–2566 (D.N.J., 6/1/79). Having experienced the difficulties and delays encountered by that method, PVSC obviously went the other route for the dewatering process.

Passavant argued, at all stages, that the use of the "average pressure" component made it impossible to perform calculations because the term is one of art applicable only to vacuum processes (not included by the specifications). Nowhere in the Blais testimony or elsewhere does Passavant make any attempt to explain what "average pressure" means in vacuum filter technology or to show why the calculation cannot be made for the three kinds of filter presses that were allowed. There is only the bald assertion, shrouded in mystery.

The colloquy at the oral argument on this subject was not designed to define the term, a task the court cannot undertake, but was intended to draw forth from Passavant whatever there might be to support the bald assertion, if anything there be. Nothing of this sort was elicited.

Nor will it do to argue that PVSC will not know until the test runs in the fall of 1981 whether the successful bidder's equipment will do the job on a performance basis. The same unknown is true in every contract that calls for the creation of something that did not exist before and that takes some period of time to create. Even ordinary school buildings have been known to collapse when nearly completed. See *School Trustees v. Bennett,* 23 N.J.L. 513 (Sup.1859).

Performance bonds are the traditional tool by which public bodies or procurement officials provide assurance that the bid job will be done at the bid price. It is not a perfect tool, but its use is entirely rational.

The "test-run" method is widely used to insure that process plants will function and perform to do the desired task. It is probably the only rational method in cases where the process and the equipment to perform it are closely intertwined. Such arrangements are commonly called "turn-key" projects. The contractor undertakes to provide a process and the equipment to perform it that will in combination achieve a specified result. When it is finished and the test runs completed, the owner can turn the key and operate a plant that does what he expects it to do. The owner and eventual operator has little interest in which process or whose equipment is used, so long as the combination does the job.

It is also evident that Passavant's argument and the Blais testimony approach the subject as though nothing were known about filter press technology or available kinds of equipment; as though this were the first dewatering plant ever built. This is an unrealistic and imaginary approach that assumes complete ignorance on the part of PVSC staff and its consulting engineers and on the part of EPA staff. On the

contrary, the presumption is that both agencies do possess the necessary expertise, especially in an empirical field such as engineering.

Absent a clear showing on Passavant's part, evident from the administrative record, any attempt to have a court reach a different conclusion on such highly technical matters would unavoidably require a trial *de novo* on the issue, which the court may not undertake.

The record before the court shows that there was a rational basis for the use of performance specifications particularly to invite bids from as broad a spectrum of the available sources of equipment as possible. Passavant overlooks the fact that the Congress itself, quite aside from EPA regulations, has recognized the use of performance specifications. See 33 U.S.C. § 1284(a)(6).

Two subordinate points remain. One has to do with the composition of the record for review, and the other with the issue of "standing".

■ Passavant asks the court to examine a group of documents culled from EPA files on the project after the Regional Administrator's decision was announced. This the court cannot do. Passavant had the opportunity to cull files from the time of its initial protest in February. Had it done so and presented these or other materials either to PVSC or to EPA, not only would these items have become part of the record but other parties would have had notice and an opportunity to present still other items to controvert those offered by Passavant. To allow these items now would not only be to use a different record than the agency record, but it would deprive adverse parties of the opportunity to meet the new items. And, if adverse parties were allowed such an opportunity now would be to convert a narrow judicial review of the record into a trial *de novo.*

■ The same problem exists in respect to the thick volume of specifications. All parties agree that everyone in the case had a set, yet they were not made part of the

record. The court declines the invitation to inspect this massive tome. Not only is there no testimony to explain it, but the judiciary has no skilled engineering staff to give the document meaning. Besides that, such specifications inevitably are accompanied by a set of drawings, without which the specifications would be incomplete.

On the matter of standing, the court is satisfied that the Besser plaintiffs lack standing because of the absence of any direct pecuniary interest in the dispute. As owners of vacant land in the District and as taxpayers, they may or may not be affected indirectly. If Passavant's challenge had been successful and the job required to be rebid, that result would hardly assure the owner of vacant land that his costs for sewage disposal would be reduced. They could well be increased. As is well-known in the anti-trust field, a successful anti-trust suit may accomplish no more than to assure the survival and subsidy of marginal or inefficient competitors at the cost of higher prices to the public.

In the case of Passavant, while it cannot claim to have incurred cost and expense in preparing an unsuccessful bid, and while it may have chosen the course it did in order to attack the specifications themselves, the court prefers to assume standing without deciding it, and to reach the merits.

Submit order in accordance with this ruling within 10 business days, including a provision that the counterclaim of Performance Systems, Inc. has been mooted by the decision without ruling on it.