**CITY OF ROCHESTER, a municipal corporation of the State of Minnesota; Paul A. Laurence Company, a Minnesota corporation; VanKnight Steel Erection, Inc., a Minnesota corporation; and Lopez, Inc., a Minnesota corporation, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and John C. McGuire as Administrator of Region V of the United States Environmental Protection Agency and not personally, Defendants.**

Civ. No. 3–80–460.

United States District Court,
D. Minnesota,
Third Division.

Aug. 27, 1980.

---

**2.** Particularly relevant in this case is footnote 9 on page 88, 97 S.Ct. on page 279.

Frederick S. Suhler, Jr., City Atty., Rochester, Minn., for plaintiff City of Rochester.

Martin G. Weinstein, William Z. Pentelovich and Rebecca A. Palmer, Maslon, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for plaintiffs Paul A. Laurence Company, VanKnight Steel Erection, Inc., and Lopez, Inc.

Theodore Davis, Minneapolis, Minn., for plaintiff Paul A. Laurence Company.

Christopher L. Rissetto, Walstad, Kasimer, Tansey & Ittig, Washington, D. C., for Paul A. Laurence Co., and The Woodbury Blair Mansion.

Thomas Berg, U. S. Atty. by Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., Stephen M. Sorett, Washington, D. C., and Robert M. Andersen, Chicago, Ill., for the United States Environmental Protection Agency and John C. McGuire.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

RENNER, District Judge.

The above–entitled matter came before the undersigned on August 14, 1980, pursuant to Rule 65(a)(2), Fed.R.Civ.P., and the Temporary Restraining Order entered by this Court on August 4, 1980, for consolidated hearing of plaintiffs' application for preliminary injunction together with trial on the merits of plaintiffs' complaint.

Based upon all the files, records, and proceedings herein, including the affidavits submitted to the Court, the memoranda submitted by the parties and the arguments of counsel, the Court being duly advised in the premises, the Court does hereby issue the following Findings of Fact, Conclusions of Law, and Order for Judgment and the attached Memorandum.

### FINDINGS OF FACT

1. Plaintiff City of Rochester, Minnesota is a municipal corporation of the State of Minnesota (hereinafter "Rochester").

2. Plaintiff Paul A. Laurence Company (hereinafter "PALCO") is a Minnesota corporation with its principal place of business in Plymouth, Minnesota.

3. Plaintiff VanKnight Steel Erection, Inc. (hereinafter "VanKnight") is a Minnesota corporation with its principal place of business in West St. Paul, Minnesota.

4. Plaintiff Lopez, Inc. (hereinafter "Lopez") is a Minnesota corporation with its principal place of business in St. Paul, Minnesota.

5. Defendant United States Environmental Protection Agency (hereinafter "EPA") is an executive agency of the Unit-

ed States of America, which has the power and authority to award construction grants pursuant to the provisions of Title II of the Clean Water Act, 33 U.S.C. § 1281, *et seq.*

6. Defendant John C. McGuire is the Regional Administrator of Region V of the EPA (John C. McGuire is hereinafter referred to as "Regional Administrator").

7. Region V of the EPA administers construction grants programs in the geographical region of the United States which includes the City of Rochester, Minnesota.

8. The amount in controversy herein exceeds in value the sum of $10,000, exclusive of interest and costs, and arises under the laws of the United States.

9. In 1918 a hydroelectric dam was built near the confluence of the South Fork of the Zumbro River and Dry Run Creek. This dam created Lake Zumbro, a long, thin lake positioned essentially north and south. Its length is about six miles and its average width is about .2 miles.

10. Although Lake Zumbro is not within the city limits of Rochester, it is the only multi–purpose recreational lake within a thirty–mile radius of the city, and the level of recreational use of Lake Zumbro during the summer is heavy.

11. For many years the effluent discharged by the existing Rochester wastewater treatment plant into the Zumbro River has allegedly exceeded the levels allowed by state and federal regulatory agencies. Since 1971, Rochester, the Minnesota Pollution Control Agency ("MPCA") and the EPA have participated in a variety of administrative proceedings which dealt with the question of alleged pollution of waters of the South Fork of the Zumbro River by effluent discharges from the existing wastewater treatment plant.

12. In 1972, Rochester and MPCA entered into a stipulation which required the City to undertake "a program for construction of such improvements and sewage and/or disposal facilities necessary to obtain" the required effluent limitations.

13. In 1978, Rochester petitioned MPCA for a variance from certain of its regulations which govern the operation of its existing wastewater treatment facilities. Said application for a variance was denied by MPCA pursuant to a Report of Hearing Examiner.

14. Thereafter Rochester obtained a reissued National Pollutant Discharge Elimination System Permit (hereinafter "NPDES Permit") by virtue of which it is permitted to continue, until December 31, 1982 to discharge effluent meeting certain standards specified in said NPDES Permit into the South Fork of the Zumbro River. The time period the NPDES Permit is effective coincides with the planned construction schedule for an advanced wastewater treatment facility which Rochester wishes to build at the site of the current treatment plant in Rochester on the Zumbro River about ten miles south of Lake Zumbro.

15. At present, the Rochester wastewater treatment plant treats a daily average flow of 9,360,000 gallons of sewage from a sewer system serving the area within the corporate limits of Rochester as well as certain areas adjacent to the City.

16. The existing plant facility appears to be inadequate to treat sewage so that the "five–day biochemical oxygen demand" (BOD) of the discharged effluent allegedly exceeds the limitations established in the NPDES Permit.

17. The proposed construction project is designed to enable Rochester to treat effluent discharged into the South Fork of the Zumbro River so that it will meet at least the standards required by the current NPDES Permit and probable more restrictive standards to be required for effluent discharges from the completed, enlarged and upgraded facility in the future.

18. On or about September 27, 1978, EPA adopted and published certain regulations pursuant to the Clean Water Act of 1977 to govern the award and administration of construction grants made pursuant to Title II of the Clean Water Act of 1977. Said regulations appeared in the Federal Register, Volume 43, No. 188, on Wednesday, September 27, 1978. Said regulations

are, and at all times material hereto, have been in full force and effect.

19. On or about December 26, 1978, EPA issued a "Statement of Policy for Increased Use of Minority Consultants and Construction Contractors with Respect to Grants for Construction of Treatment Works" (hereinafter "Statement of Policy"). Said Statement of Policy appeared in the Federal Register, Volume 43, No. 248, Tuesday, December 26, 1978. Said Statement of Policy is, and at all times material hereto, has been in full force and effect.

20. On or about January 1, 1979, EPA Region V issued an Appendix to its "MBE Guidance Suggested Specification for MBE Participation" (hereinafter "Region V Appendix").

21. On or about September 1, 1979, Rochester submitted its application for grant funds pursuant to the Clean Water Act of 1977 to EPA in accordance with the provisions of the Act, the regulations, and all other pertinent rules and regulations.

22. In its grant application Rochester proposed to use funds granted by EPA to pay 75% of the cost of constructing additions and modifications to the existing Rochester wastewater treatment facility to provide advanced wastewater treatment and phosphorus removal, all as otherwise detailed in plans and specifications entitled "Advanced Wastewater Treatment Rochester, Minnesota, Water Reclamation Plan" (hereinafter referred to as "Plans and Specifications"). The remaining costs of constructing the new facility were to be borne as follows: State of Minnesota, 15%; City of Rochester, 10%.

23. The Plans and Specifications included in the application to EPA contained a proposed "Notice to Contractors and Notice of Qualification and Instruction to Bidders" (hereinafter "Invitation for Bids"). Said Invitation for Bids provided, in pertinent part:

"Any contract or contracts awarded under this Invitation for Bids are expected to be funded in part by a grant from the United States Environmental Protection Agency (EPA). Neither the United States nor any of its departments, agencies, or employees is or will be a party to this invitation for any resulting contract. The procurement will be subject to regulations contained in 40 C.F.R. 35.936, 35.-938 and 35.939 and the EPA policy and goal regarding the increased use of minority business enterprise (MBE). The policy as well as the cited regulations are contained in the specifications. The MBE goal for this contract is 10–15%."

The Plans and Specifications submitted with the grant applications to EPA by Rochester contained photocopies of 40 C.F.R. §§ 35.936, 35.938 and 35.939; a photocopy of the Statement of Policy; and a photocopy of the Region V Appendix.

24. On October 5, 1979, the Regional Administrator advised Rochester in writing that its application for grant funds had been approved and tendered to Rochester a grant of $38,829,375. The letter from the Regional Administrator advising Rochester that its application had been approved stated that "this award constitutes approval of project plans and specifications."

25. On February 4, 1980, Rochester formally advertised for bids for construction of the facility. The Invitation for Bids which was issued by Rochester was identical in all material respects to the Invitation for Bids contained in the Plans and Specifications approved by EPA.

26. The Invitation for Bids stated:

(a) That the work provided for therein would be done "under written contract with the responsible bidders submitting the lowest acceptable bid in accordance with the requirements of the contract documents and as provided by law."

(b) That conditions and requirements imposed on the procurement by EPA which provided basic procurement standards, formal advertising and related bid protest rules applied.

(c) That EPA's goal for the project was 10–15% participation by minority business enterprises as defined by EPA.

(d) That the city would have certain fundamental rights to waive irregularities and/or reject all bids.

27. Said Invitation for Bids, as approved by EPA and issued by Rochester, had attached thereto as exhibits copies of the following documents:

(a) 40 C.F.R. §§ 35.936, 35.938 and 35.939;

(b) The Statement of Policy; and

(c) The Region V Appendix.

28. The Invitation for Bids stated that sealed proposals for construction of the facility would be publicly opened at the Rochester City Hall at 2:00 p. m. on April 17, 1980.

29. In April 1980 Rochester modified the Region V Appendix by deleting the word "Suggested" from its title. The modification was contained in Addendum 4 to the Plans and Specifications, which Rochester mailed to all plan holders several weeks before the bids were opened.

30. Approximately two and one half weeks prior to the opening of bids a meeting was conducted by Rochester for prospective bidders. EPA was invited to attend said meeting to explain its MBE requirements and any other matters which EPA wished to discuss. EPA did not attend said meeting.

31. The public opening of bids was held as advertised on April 17, 1980, in Rochester. Seven bids were submitted and opened. The apparent low bid was submitted to Rochester by PALCO in the amount of $52,922,403. The next apparent low bidder was M. A. Mortenson Co. at a bid price of $54,292,403. Other bidders included Darin & Armstrong, Kraus–Anderson/PMW, Newberg, Foster & Paschen, Martin K. Ebby Construction Co., Inc. and Oscar J. Boldt Construction Co. The highest bid submitted was in the amount of $66,111.403.

32. The bid submitted to Rochester by PALCO was properly executed and committed PALCO to exercise positive efforts to comply with the MBE policy to achieve the stated goal of MBE participation and, accordingly, PALCO's bid was responsive within the terms of the Invitation for Bid.

33. PALCO had previously submitted a bid and awarded a contract for an EPA–funded project for construction of a wastewater treatment plant at Bowling Green, Ohio. The Invitation for Bids for the Bowling Green project contained MBE requirements identical to the requirements in Rochester's Invitation for Bids and incorporated the same EPA regulations, Statement of Policy, and Region V Appendix as were attached to the Rochester Invitation for Bids. At the time the bids were opened for the Bowling Green project, PALCO met substantially none of the MBE elements. However, subsequent to the bid opening and prior to final EPA approval of award of the contract to PALCO, PALCO did expend good faith efforts and achieved the goal required by EPA for said project.

34. In light of the fact that the MBE elements for Rochester were substantially identical to the MBE elements for Bowling Green, and in light of the fact that in that instance EPA permitted PALCO without objection to submit information concerning certain MBE elements subsequent to bid opening, PALCO had good cause for interpreting the Rochester Invitation for Bid to mean that MBE compliance could be demonstrated subsequent to bid opening and prior to award of the contract.

35. Together with its bid, PALCO submitted documentation to Rochester that it had advertised its intentions to bid on the Rochester project in six plan rooms, had specifically advertised for MBE subcontractors and suppliers in a widely read regional construction trade bulletin having a readership of 20–25,000 for a period of six weeks prior to bid opening, sent individual letters to sixty–eight MBE firms identified through the use of MBE directories obtained from the Metropolitan Economic Development Association, the Minnesota Minority Purchasing Council, the Minnesota Department of Economic Development and the Associated General Contractors of America. The individual letters specifically requested subcontractor bids on items which had been noted in the various directories as being within each contractor's area of expertise.

36. As a result of these positive efforts on the part of PALCO prior to bid opening,

PALCO was able in its bid to certify to the attainment of 2.7% of the 10–15% goal. This was a substantially better certification of goal attainment than PALCO was able to make at the time it submitted its bid for the Bowling Green project.

37. In every instance where a government contract is awarded through competitive bidding, the bid must be both "responsive" and the bidder "responsible". The Invitation for Bids by Rochester required the bid to be "responsive" and the bidder "responsible".

38. A "responsive" bid usually is a bid wherein the bidder promises to do exactly, precisely, and specifically what the Invitation for Bids requests the bidder to do. The question of whether a bid is "responsive" is determined by the contracting agency on the basis of the information submitted by the bidder with his bid and upon facts available at or prior to the time of said opening. The government agency evaluating the bid has little discretion on matters of responsiveness and a bid either complies precisely with the Invitation for Bid and is, therefore, "responsive", or it fails to comply precisely with the Invitation for Bid and is, therefore, not "responsive".

39. A "responsible" bidder is one who can or will be able to perform the contract as promised. The responsibility requirement does not require the bidder to agree to do exactly and precisely what the Invitation for Bid requests and, therefore, does not involve the question of whether a bidder has submitted a proper or "responsive" bid. Although Bid evaluators have no discretion whatever with respect to determining responsiveness, bid evaluators have wide discretion in determining matters of responsibility. In determining whether a bid is "responsible" the government agency may base its decision not merely on information or facts known or submitted at the time of the bid, but may also base its decision on facts made available subsequent to the opening of the bid and prior to the time the contract is awarded. This is a critical distinction between "responsiveness" and "responsibility" because information going

to responsibility may generally be submitted to the contracting agency by the bidder subsequent to the bid opening and prior to bid award in order to provide the government agency with adequate basis upon which to make the responsibility determination. By contrast, on matters of "responsiveness" a bidder may submit no information subsequent to the bid opening, and the contracting agency may consider no information submitted subsequent to bid opening.

40. The Statement of Policy provides:

"D. *Sanctions*

(1) *Responsibility Determination.* In the event a bidder or offeror fails to effectively demonstrate positive efforts to meet the stated goal requirement, the grantee shall request, in writing, that the bidder or offeror provide within a reasonable time as stated by the grantee the necessary evidence of positive efforts or be held *nonresponsible.*

Where the bidder or offeror fails to objectively demonstrate the required positive efforts, the grantee, in conjunction with its function of deciding responsibility in each case, shall determine the bidder or offeror to be *nonresponsible.*"

41. On April 22, 1980, Rochester's consulting engineers wrote to PALCO and requested that PALCO "submit, before April 29, 1980, the evidence of positive efforts to meet the 10% MBE goal."

42. On April 29, 1980, PALCO submitted substantial additional data to Rochester documenting its positive efforts to obtain the MBE goal. PALCO stated at the time of submission of said documentation that its MBE participation was 7.45% and further stated that the total dollar amount of MBE participation was as of that date $3,830,410. The submission contained a further notation that final dollar amounts for MBE participation were likely to be higher upon completion of the project and that PALCO had not yet contracted for certain project activities which would probably involve MBEs.

43. Subsequent to April 29, 1980, PALCO continued its positive efforts to attain the 10–15% MBE participation goal, which it had promised to use its best efforts to obtain by properly signing its bid on April 17, 1980.

44. Several bid protests were filed with Rochester objecting to award of the contract to PALCO.

45. On May 5, 1980, the Rochester Common Council held a public hearing upon said protests.

46. Following said public hearing, the Common Council adopted a resolution making the following findings of fact and conclusions:

### FINDINGS OF FACT

1. On May 5, 1980, the joint venture consulting engineers reaffirmed their preliminary recommendation of April 21, 1980, that the lowest responsive and responsible bidder on EPA project no. C 270804–03 was Laurence. [PALCO]

2. On April 17, 1980, the public was advised for each bidder of the lump sum bid amount; the lump sum total amount plus present worth of power; and the percentage of proposed MBE participation.

3. On April 22, 1980, the contents of the proposals submitted by each bidder were made public.

4. On April 17, 1980, a telegram was received from Premier Electric Company (Premier), a named subcontractor on the bid submitted by K.A./P.M.W. [Krause-Anderson/P.M.W.] protesting the MBE percentage of bidders lower than K.A./P.M.W.

5. On April 29, 1980, a letter was received from Premier which reiterated its protest of the MBE percentage shown by Laurence; and further protested that Mortenson [M.A. Mortenson Co.] had failed to list equipment suppliers; and, Laurence and D. & A. [Darin & Armstrong] had failed to list subcontractors.

6. On April 18, 1980, a telegram was received from K.A./P.M.W. protesting the award of the contract to any bidder who did not meet the MBE participation percentage goal at the time of the bid opening.

7. On April 23, 1980, D. & A. delivered a written protest that the bids of Laurence and Mortenson failed to list required subcontractors.

8. On April 24, 1980, a telegram was received (followed by a letter received April 28, 1980) from K.A./P.M.W. protesting that the bids of Laurence, Mortenson, and D. & A. were non–responsive in that they failed to list a MBE participation percentage at the time of the bid opening within the project goal.

9. On April 28, 1980, a letter was received from Precision Contractors, Inc., complaining that certain bidders had failed to comply with MBE participation percentage goals for the project.

10. On April 30, 1980, a letter was received from Newberg, complaining that Laurence, D. & A., and Mortenson had failed to comply with MBE participation percentage goals for the project. Further, that K.A./P.M.W. did not submit a responsive bid because the items: 'total present worth of oxygen system power costs' and 'sum of the lump sum bid, plus total present worth of oxygen system costs' were not completed.

11. The basis of any protest relating to proposed MBE participation percentage was or should have been known to any party with an adversely affected financial interest on April 17, 1980.

12. The basis of any protest relating to any omission on the face of any proposal was or should have been known to any party with an adversely affected financial interest on April 22, 1980.

13. The protest filed by D. & A. in part erroneously referred to Chapter 43 of the Code of Federal Regulations rather than Chapter 40.

14. The proposals of Laurence and Mortenson failed to list, at page P–6, subcontractors for the electrical and mechanical work respectively.

15. The proposal of Mortenson did not omit on items numbers 12, 27, and 28 on P–4 the names of equipment suppliers.

16. The proposal of K.A./P.M.W. on page P–1 did not have entries in the spaces reserved for 'total present worth of oxygen system power costs' and 'sum of the lump sum bid plus total present worth of oxygen system power costs'. This information is ascertainable from a review of other parts of the proposal and by simple mathematical computation.

17. The proposed MBE participation percentage of 2.7% initially noted by Laurence represented firm minority subcontracts as of the date of the bid opening. Since that date, the participation has risen to in excess of 7.4%, with the possibility that it will ultimately become greater.

Based upon the foregoing, the Common Council makes the following:

## CONCLUSIONS

The communications received from Precision Contractors, Inc., and Newberg were not timely protests under the time constraints set forth in 40 C.F.R. 35.939(b).

Premier is a party with an adversely affected financial interest and entitled to maintain its protest in this matter.

The omission by K.A./P.M.W. of certain information on page P–1 of its proposal is not a material omission in that the information may be obtained from other data submitted with the proposal by a process of addition.

The proposal submitted by K.A./P.M.W. was responsive.

The mistake by D. & A. in the citation of certain provisions of the Code of Federal Regulations in its protest was a minor error which did not deprive the grantee or other parties of fair notice of the substance of the protest.

D. & A.'s protest was timely and complied with the requirements of 40 C.F.R. § 35.-939(c).

The bids submitted by Laurence and Mortenson were responsive despite the omission of certain information relating to subcontractors.

The protest filed by D. & A. is disallowed by virtue of 40 C.F.R. § 35.938–4(h)(6).

The bids submitted by Laurence, Mortenson, and D. & A. were responsive with respect to the protest that the MBE participation percentage was inadequate.

The protests filed by K.A./P.M.W. and Premier with respect to MBE participation percentage are disallowed by virtue of the language contained at page MBE–1 of the *Appendix to Region V Guidance* [Region V Appendix] which was incorporated into the specifications.

The bid submitted by Mortenson was responsive and complete with respect to the listing of equipment suppliers.

The protest of Premier with respect to the responsiveness of Mortenson is disallowed.

The protest of Premier with respect to the responsiveness of Laurence is disallowed.

The bid of Laurence is that of the lowest responsive and responsible bidder, and Laurence is entitled to award of the contract herein."

47. Following the resolution of the Rochester Common Council on May 5, 1980, various bid protestors appealed the determination reached by Rochester to the Regional Administrator.

48. 40 C.F.R. § 35.939(e)(4) establishes the following standard of review for bid protest appeals by the Regional Administrator:

"The Regional Administrator may review the record considered by the grantee and any other documents or arguments

presented by the parties, to determine whether the grantee has complied with this subpart and has a rational basis for its determination."

49. Subsequent to the filing of the appeals of the determination by Rochester, Rochester transmitted to the Regional Administrator the record considered by Rochester. Various parties submitted to the Regional Administrator other documents and arguments.

50. On May 22, 1980, MPCA advised Rochester that BOD levels for effluent discharged in the first quarter of 1980 were beyond the limits set forth in the NPDES Permit.

51. Subsequently, on July 2, 1980, the Enforcement Division of Region V of EPA issued a Notice of Violation to Rochester pursuant to § 309(a)(1) of the Clean Water Act of 1977 notifying Rochester that it was in violation of certain provisions of its NPDES Permit.

52. The Notice of Violation served by EPA proposes that appropriate sanctions be imposed pursuant to 33 U.S.C. § 1319 if MPCA has not "initiated an appropriate action" against the City within thirty days of the notice.

53. On July 2, 1980, the Regional Administrator issued his determination in the matter of *Port Austin, Michigan* (Protest of Amado Cardenas d/b/a National Excavating Co.). In said determination the Regional Administrator determined, for the first time, that the Region V Appendix was in certain respects confusing and ambiguous.

54. On July 16, 1980, the Regional Administrator sent a telegram to affected parties in the Rochester matter stating:

"I find that ambiguity of MBE bid specifications by reason of Region V Appendix being attached thereto, is good cause for rejecting all bids pursuant to 40 C.F.R. § 35.938–4(h)(2) and P.R.M. 78–8. All bids for EPA contracts C 270804–03 should be rejected and a new Invitation for Bids issued. EPA to assist grantee in expediting the solicitation of bids."

55. On July 17, 1980, PALCO submitted a request for reconsideration by EPA of said telegraphic determination.

56. On July 24, 1980, the Regional Administrator issued a written opinion supporting its determination. The stated basis of his determination was that the Region V Appendix "as supplied to the grantee contained internally inconsistent statements which were sufficiently ambiguous as to when positive efforts to comply with the stated MBE goal must be taken by the prime contractor to warrant rejection of all bids and resolicitation of the requirement."

57. The Regional Administrator made no specific determination that Rochester failed to comply with the provisions of subpart E of part 39 of 40 Code of Federal Regulations or that Rochester did not have a rational basis for its determination that PALCO was the low, responsive, responsible bidder and that PALCO was entitled to award of contract.

58. The determination of the Regional Administrator fails to rely upon, and is in fact contrary to, the determination of other similar protests decided pursuant to the Clean Water Act of 1977, the regulations, the Statement of Policy and guidelines similar to the Region V Appendix. Specifically, the determination of the Regional Administrator is contrary to, and does not rely upon, the decision of the Region VI Administrator in *Huntsville, Texas* (Protest of Angleton Mechanics, Inc., April 18, 1980); the determinations of the Region VII Administrator in *Hastings, Nebraska* (Protest of Horizon Construction Company, Olson Construction Company, March 7, 1980) and *Johnson County, Kansas* (April 1, 1980); and the decisions of the Region IV Administrator in *San Francisco, California* (Protest of D. W. Young Construction Company, December 20, 1979) and *Midcoastside, California* (Protest of Radco, July 23, 1979).

59. The determination of the Regional Administrator failed to rely upon decisions of the Comptroller General of the United States and of federal courts addressing federal procurements comparable to the procurement requirements contained in sub-

part E of part 39 of 40 Code of Federal Regulations.

60. On July 24, 1980, simultaneously with issuance of his determination, the Regional Administrator issued a purported "clarification" to the Region V Appendix and directed Rochester to utilize such clarification in its solicitation of bids. EPA and the Regional Administrator did not publish such "clarification" on or before July 24, 1980. Defendants failed to notify Rochester of the alleged ambiguity in the Region V Appendix before Rochester announced that Paul A. Laurence Co. was the lowest responsive and responsible bidder. Counsel for the defendants represented to the Court that the policy in question was modified by EPA in May, 1980, after the bid opening and after protests were filed, but prior to Rochester's disposition of the protests. There is no evidence in the record before the Court to support that representation. The earliest date Rochester might have become aware of the Regional Administrator's position was July 2, 1980 when the *Port Austin* determination was issued.

61. On July 31, 1980, the Regional Administrator denied PALCO's request for reconsideration of its determination.

62. On August 4, 1980, plaintiffs commenced this action by filing the complaint with the Clerk of Court. On that said date, following a hearing, this Court issued its Temporary Restraining Order which provides in relevant part:

"Defendants, and each of them, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the Court Order by personal service or otherwise are hereby enjoined and restrained, until further order of the Court from:

i. requiring the City of Rochester, Minnesota to take action pursuant to the determination of Defendant Regional Administrator dated July 24, 1980 at Chicago, Illinois, during the pendency of this action and pending entry of a final judgment herein by the Court;

ii. requiring the City of Rochester, Minnesota to issue a new Invitation for Bids for construction of an advanced wastewater treatment plant during the pendency of this action and pending final judgment by the Court; and

iii. taking any action of any kind whatever during the pendency of this action and pending the entry of final judgment by the Court herein, adversely affecting, impairing, or in any way altering the rights of the City of Rochester, Minnesota to grant funds pursuant to the provisions of the Clean Water Act of 1977 in the amount of $38,829,275 as heretofore approved by Defendant."

63. At the time the Invitation for Bids was issued, it was contemplated and intended that the successful bidder would start construction in late Spring 1980.

64. If Rochester reissues the Invitation for Bids for the facility and reconducts the bidding process, no contract will be awarded by Rochester and approved by EPA before November, 1980.

65. If no contract is awarded before November, 1980, commencement of construction of the facility will be delayed until at least April, 1981.

66. Construction of the facility is required to be completed by the Plans and Specifications within nine hundred days from its commencement. If construction were to be commenced during the remainder of the 1980 construction season, the facility in question would likely be completed and in operation by approximately January 1, 1983. However, if construction does not commence until April, 1981, the facility will not likely be completed or in operation until approximately November 1, 1983.

67. Because of delay in completion of the construction which would be occasioned by reissuance of the Invitation for Bids, the conditions of non–compliance which MPCA and EPA contend exist with respect to the terms of the NPDES Permit would be extended for approximately one year.

68. During the additional one year construction period, the Zumbro River and Lake Zumbro will, for that period of time, continue to suffer levels of pollution which MPCA and defendants find to be excessive, unacceptable and in violation of law. Thus, the delay in construction would probably result in social and environmental damages which are immeasurable and irreparable to Rochester, its citizens, as well as all citizens of the State of Minnesota and all who utilize the recreational facilities of the Zumbro River and Lake Zumbro.

69. The cost of Rochester of the issuance of the original Invitation for Bids and the cost of the bidding process totalled approximately $300,000, 10% of which cost was borne by Rochester, 15% of which was borne by State of Minnesota, and 75% of which was borne by the United States. In the event the Invitation for Bids is reissued, the costs of such reissuance and of the rebidding process could total as much as $200,000, 10% of which costs must be borne by Rochester, 15% of which must be borne by State of Minnesota, and 75% of which must be borne by the United States.

70. The delay in commencement of construction will undoubtedly result in substantially higher costs for construction of the facility. Although it is impossible to predict what the low bid upon a resoliciation of bids might be, given current economic conditions, given wage increases in the construction industry which have been increasing annually at the rate of 11% over the last few years, and given the general rate of increase in costs of construction materials, it is reasonable to expect that the low bid upon a re–bidding of the project would be about $1 million higher than the low bid submitted by PALCO.

71. From the date bids were first solicited by Rochester through the date Rochester awarded the contract to PALCO, PALCO employees spent in excess of 2,000 man hours in preparation of its bid. This effort represented the full–time work of at least eleven PALCO employees during a period of approximately three months and cost PALCO in excess of $60,000.

72. From the date of the bid opening through the date of contract award, and thereafter through the date of the Regional Administrator's determination, PALCO performed every task that it was able, short of moving upon the project site, to prepare itself to commence construction of the project. At the date of the award of the contract by Rochester, and at all times since that date, including the date of trial, PALCO has been ready, willing and able to perform the work required by the contract and to commence construction.

73. PALCO has stated to the Court that it is ready, willing, and able to commence construction immediately upon resolution of this litigation, provided that a final resolution hereof is reached on or before September 15, 1980. However, PALCO has also stated to the Court that if a final resolution of this action is not reached by September 15, 1980, PALCO will be unable to commence work during the current construction season at the bid price.

74. The actions of the Regional Administrator with respect to the award of the contract to PALCO has severely damaged the morale of the permanent employees of PALCO, particularly those many employees who have prior to bid opening and since bid opening been specifically working on this particular project.

75. Should the determination of the Regional Administrator remain unchanged, PALCO will be forced to discharge many of its permanent employees.

76. In anticipation of the construction of the project, and based upon the award of the contract by Rochester subject to EPA approval, several key employees of PALCO who were to be involved in construction of the project implemented plans to move from the Twin Cities Metropolitan area to the Rochester area, including selling their homes and purchasing homes in the Rochester area, in order that their families might be living in Rochester at the commencement of the coming school year.

77. PALCO, many of its subcontractors, and many of its suppliers, have passed up

opportunities to do other significant work in favor of this project. If the determination of the defendants is permitted to stand, PALCO and many of its subcontractors and suppliers will suffer significant economic loss which will be non—recoupable during the current construction season, thus resulting in permanent loss.

78. Lopez was founded approximately two and one half years ago by Carlos Lopez, Jr., a twenty—eight year old Hispanic male. He has been president of the company and chief operating officer since that time, and is currently the owner of 81% of its stock. Lopez is a MBE as defined by EPA. Its business is performing mechanical portions of construction including heating, plumbing and ventilation. Lopez has, in the past, participated in the construction of wastewater treatment facilities funded by EPA grants. It employs thirteen persons, all of whom reside in Minnesota or Wisconsin.

79. Prior to the opening of bids for the Rochester project, Lopez agreed with Grudem Bros., Inc., to perform part of the mechanical subcontract for the project which was being bid to PALCO by Grudem. Lopez's third—tier subcontract for a portion of the mechanical construction of the facility amounts to $750,000.

80. During its fiscal year ended September 30, 1979, Lopez had approximately $608,000 in sales. During its fiscal year ending September 30, 1980, Lopez had projected between $1.2 and $1.5 million in sales.

81. In anticipation of the contract for this facility being awarded to PALCO, Lopez kept on its payroll employees for whom it had limited work to insure their availability to Lopez so that Lopez would be able to proceed on the job immediately on receipt of notice of commencement of work on the Rochester facility.

82. Lopez continues to retain sufficient employees on its payroll to move in an expeditious fashion should this Court permit contract to be awarded to PALCO.

83. Lopez's bid on this project totals more than 50% of the projected volume of sales for Lopez during the current fiscal year. Should the determination of defendant be permitted to stand, the financial condition of Lopez and its cash flow will be seriously impaired for a period of not less than one year, and the Company's economic survival will be threatened.

84. Lopez, like PALCO, passed up or declined to bid on other substantial contracts in favor of the Rochester project and has no way to replace revenues that it will lose as a result of passing up those contracts absent working on the Rochester project.

85. VanKnight was founded on January 19, 1978, by William L. VanKnight, a thirty—three year old Black American male. He has been president of the company ever since it was founded and owned all of its stock until recently; he currently owns 51% of its stock. VanKnight is an MBE as defined by EPA. VanKnight is in the business of constructing and installing reinforcing rods, miscellaneous iron, welding and structural erection, and providing related supplies. Since its founding it has participated in the construction of five wastewater treatment facilities funded by EPA grants. VanKnight permanently employs twenty persons and on a short—term basis employs as many as 100 persons, most of whom are members of Local # 512 of the International Association of Bridge, Structural and Ornamental Iron Workers.

86. When Invitations for Bids were issued for construction of the Rochester facility, VanKnight immediately became involved in preparing the submission of proposals as a subcontractor. Prior to bid opening the company submitted such proposals for subcontracting to all seven parties which were bidding for the prime contract on the project. Prior to bid opening, VanKnight submitted to PALCO a scope letter outlining the terms and conditions of what VanKnight would be bidding and specifying the items which VanKnight would bid upon. On the morning of the bid opening, VanKnight submitted to PALCO its bid price of $2,760,630, which price was accepted by PALCO and included in deter-

mining the bid which PALCO made to Rochester.

87. During its fiscal year ended April 30, 1979, VanKnight had approximately $274,000 in sales. During its fiscal year ending April 30, 1980, VanKnight had between $1.6 and $1.7 million in sales.

88. VanKnight's bid on this project totals more than the entire volume of sales of VanKnight since its conception and is, accordingly, a bid of major importance to VanKnight.

89. VanKnight would employ between 5 and 15 people specifically on this project, several of whom will be members of minority groups.

90. In the event defendants' determination is permitted to stand, VanKnight would be forced to lay off a minimum of ten persons, including at least two minority group members.

91. In anticipation of this project, VanKnight passed up or declined $3 million worth of work and it is anticipated that VanKnight will not be able to replace more than 40%, if that much, of the business which has been passed up or declined in favor of this project.

92. The failure of VanKnight to obtain this contract will seriously impair its financial condition and will adversely affect its cash flow situation for a period of not less than six months. Further, it will impair the credibility of VanKnight with certain suppliers and with its bonding company.

93. It is the intention of Rochester to issue sewer revenue bonds to pay for the costs which will be incurred by Rochester in constructing the proposed facility, to the extent such costs are not reimbursed by state or federal grants.

94. It is anticipated that if the contract is let to PALCO the City will have to issue approximately $5.4 million worth of sewer revenue bonds. Said bond issue will be the single largest bond issue in the history of Rochester.

95. Repayment of the obligations incurred by Rochester through issuance of said sewer revenue bonds will be made from collections upon sewer charges made to property owners in and around Rochester who are connected to Rochester's sewer system. Assuming that the contract is let to PALCO upon its low bid, it is anticipated that the sewer charges to said users will approximately double.

96. In the event Rochester re–issues its Invitation for Bids, and the commencement of construction is delayed until April 1981, causing the anticipated increased cost of the project, Rochester will have to issue a larger amount of bonds. In that event, there is a substantial probability that the increased costs, plus increased interest rates, would require Rochester to increase sewer use charges by as much as 120% to 130%. This increase would apply for a period of fifteen to twenty years, thus passing a large share of the costs caused by delaying construction on to future generations of citizens of Rochester.

97. Plaintiffs, and each of them, have properly alleged that the determination of the Regional Administrator has resulted in injury in fact to plaintiffs, and each of them.

98. Plaintiffs, and each of them, have properly alleged that the interests of plaintiffs, and each of them, sought to be protected in this action are arguably within the zone of interest to be protected or regulated by the statutes, regulations, statements of policy, guidelines, and constitutional guarantees at issue herein.

99. Because of their interpretation of the Plans and Specifications relating to MBE participation, certain bidders–Kraus Anderson/P.M.W., Newberg, and Foster & Pachen–exercised all their positive efforts to comply with the MBE requirements prior to bid opening. Moreover, they were unable to avail themselves of post bid opening opportunities to obtain MBE's, such as bid shopping, while PALCO, the apparent low bidder, may have been. Although the precise amount of the dollar effect on their bids has not been quantified, the protesters' misinterpretation of the specifications could well have caused their bids to be somewhat

higher than they would otherwise have been. They, however, at no time sought clarification of the specifications, nor was any clarification offered by the defendant until July 24, 1980.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the above–entitled action pursuant to the provisions of the Judicial Code, 28 U.S.C. §§ 1331, 1361 and 1651, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

2. Each of the plaintiffs has standing to maintain this action.

3. The EPA Region V. Appendix to its "Suggested Specification for MBE Participation" was not ambiguous within the meaning of EPA Program Management Requirement 78–8. The Regional Administrator did not, therefore, have good cause for rejection of all bids.

4. Rochester complied with the provisions contained in Subpart E of Part 39 of 40 C.F.R.

5. Rochester had a rational basis for its determination.

6. The determination of the Regional Administrator is without a rational, reasonable and just basis.

7. The determination by the Regional Administrator is arbitrary, capricious and an 'abuse of discretion.

8. The purported "clarification" to the Region V Appendix issued by the Regional Administrator contemporaneously with the issuance of the determination is not binding upon the plaintiffs herein, because the purported "clarification", insofar as the EPA seeks to bind plaintiffs to its terms, attempts to give retroactive effect to a new regulation which was not adopted until the date of the Regional Administrator's determination in this matter, such retroactive effect being contrary to the Fifth Amendment to the Constitution of the United States and the Administrative Procedure Act.

9. The bid of PALCO is responsive, and PALCO is in all respects a responsible bidder which has complied at all stages with

the regulations, the Statement of Policy and the Region V Appendix.

10. Public and private equitable considerations as well as the law require the Court to enter judgment for the plaintiffs.

## ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law,

IT IS ORDERED as follows:

1. The determination by the Regional Administrator is invalid and contrary to law and is, therefore, vacated and reversed.

2. Rochester's determination is, in all respects, reinstated.

3. Defendants are directed to approve Rochester's award of the contract for construction of the advanced wastewater treatment project to PALCO in writing and to deliver said written approval by telegram to Rochester not later than forty–eight hours after entry of judgment herein.

4. Defendants are directed to deny all bid protests pending before them in connection with construction of the advanced wastewater treatment facility by Rochester not later than forty–eight hours after entry of judgment herein.

5. Defendants are permanently enjoined and restrained from requiring Rochester to issue a new Invitation for Bids for construction of the advanced wastewater treatment plant which is the subject of this action or from requiring Rochester to take any other action pursuant to the determination of the Regional Administrator.

6. Defendants are enjoined and restrained from adversely affecting, impairing, or in any way altering the rights of Rochester to grant funds pursuant to the Clean Water Act of 1977 as heretofore approved by defendants.

LET JUDGMENT BE ENTERED ACCORDINGLY

## OPINION

By this action, plaintiffs seek to enjoin the Region V Administrator of the defend-

ant Environmental Protection Agency (EPA) from enforcing his decision to reject all bids on the prime contract for the construction of a new advanced wastewater treatment facility by the plaintiff City of Rochester, Minnesota. The Regional Administrator set aside Rochester's determination that plaintiff Paul A. Laurence Co. (PALCO) was the low responsive, responsible bidder after finding that specifications for participation of Minority Business Enterprises (MBE) included in Rochester's invitation for bids were ambiguous and jeopardized the competitive procurement process.

The plaintiffs argue that the Regional Administrator exceeded his scope of review, that he ignored national EPA policies and directives, that he retroactively attempted to apply changes in Region V policy, that he breached EPA's contract with Rochester, that the specifications were not ambiguous, and that he ignored the public interest and equity.

The defendants argue that it is the EPA's responsibility, as steward of federal construction grants, to oversee grantees' procurement of contracts for federally funded environmental construction projects in order to insure that important federal policies are followed. Such policies include the preservation of free and open competition. It contends that the Regional Administrator was correct in finding that ambiguities existed in the bid specifications detrimental to competition.

## I.

■■ It is settled doctrine that where an administrative agency has exceeded its authority, or failed to follow the applicable requirements of agency regulations, and has failed to act in the public interest, court intervention is appropriate. *See Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This doctrine applies to the regulation of government procurements. *M. Steinthal & Co. v. Seamans*, 147 U.S.App.D.C. 221, 455 F.2d

1289 (D.C.Cir.1971). Even the strong public interest in avoiding disruption of the procurement process must give way to the public interest in requiring agencies to stick to their regulations. *Schiavone Construction Co., Inc. v. Samowitz*, 451 F.Supp. 29 (S.D.N.Y.), *affirmed*, 578 F.2d 1370 (2nd Cir. 1978).

■ Because Congress did not intend to transfer its legislative power to the unbounded discretion of administrative agencies, those agencies must make findings that support their decisions, and those findings must, in turn, be supported by substantial evidence. A rational connection between the facts found and the remedy ordered must be articulated. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

■ In reviewing a determination of the Regional Administrator, the Court must conduct a careful, searching inquiry but may not substitute its own judgment for that of the Regional Administrator. His determination may not be overturned unless it lacks a rational, reasonable and just basis. *M. Steinthal & Co. v. Seamans, supra; Passavant Corp. v. United States Environmental Protection Agency*, 477 F.Supp. 1200 (D.N.J.1979); *BSP Division of Envirotech Corp. v. United States Environmental Protection Agency*, 471 F.Supp. 958 (D.N.J. 1979); *CCTW&M v. United States Environmental Protection Agency, Region II*, 452 F.Supp. 69 (D.N.J.1978); *Schiavone Construction Co., Inc. v. Samowitz, supra; Lametti & Sons, Inc. v. City of Davenport, Iowa*, 432 F.Supp. 713 (S.D.Iowa 1975); *Darin & Armstrong, Inc. v. United States Environmental Protection Agency*, 431 F.Supp. 456 (N.D.Ohio), *vacated and remanded on other grounds*, 542 F.2d 1175 (6th Cir. 1976).

## II.

In reviewing EPA–funded construction project bid protest appeals, the Regional Administrator must follow the standard which EPA has established in 40 C.F.R. § 35.939(e)(4), which states:

"The Regional Administrator may review the record considered by the grantee and any other documents or arguments presented by the parties, to determine whether the grantee has complied with this subpart and has a rational basis for its determination."

Here, the Regional Administrator failed to specifically state that the grantee had neglected to comply with subpart E, nor did he specifically state that there was no rational basis for the grantee's determination. Thus, in order to determine if the EPA had a reasonable, rational and just basis for rejecting the grantee's determination, it is necessary to examine the regulations and the facts to decide whether or not the EPA's determination that there was an ambiguity which jeopardized the competitive bidding process was the equivalent of finding noncompliance with the regulations or lack of a rational basis for determining the contract should go to PALCO.

Office of Management and Budget (OMB) Circular No. A–102, "Standards Governing State and Local Grantee Procurement", 44 Fed.Reg. 47874 (August 15, 1979), places responsibility on the grantee,

"in accordance with good administrative practice and sound business judgment, for the settlement of all contractual and administrative issues arising out of procurements entered into in support of a grant. These include but are not limited to source evaluation, protests, disputes and claims. Executive agencies shall not substitute their judgment for that of the grantee unless the matter is primarily a Federal concern." 44 Fed.Reg. at 47874–5.

Furthermore, no additional procurement requirements or subordinate regulations should be imposed upon grantees by executive agencies unless specifically required by federal law or executive orders or authorized by the Administrator for Federal Procurement Policy. This is to insure that a balance is struck between the agencies' stewardship role[1] and the policy of placing maximum reliance on grantees to conduct their own affairs. 44 Fed.Reg. at 47874.

Plainly, protection of the competitive procurement is a matter primarily of federal concern.[2] Thus, the balance weighs heavily in favor of the EPA on its disposition of questions arising in this area. While contractors have the right to reasonable treatment of their bids, *William F. Wilke, Inc. v. Department of the Army*, 485 F.2d 180 (4th Cir. 1973); *Lametti & Sons, Inc. v. City of Davenport, Iowa, supra*, they do not have a vested interest in the contract until EPA accepts the bid. As against the bidder, the government has an absolute right to reject all bids. *CCTW&M v. EPA, supra; Lametti & Sons, Inc. v. City of Davenport, Iowa, supra*.

The limitation of the grantee's discretion in entering into the contract is necessary because EPA's 75 percent contribution makes its interest in eliminating anti–competitive requirements paramount to those of the grantee. Thus, in *CCTW&M v. EPA, supra*, where the EPA found a feature of the specifications containing competence requirements to be detrimental to the competitive bidding process, it was not prohibited from rejecting all bids, even though it had approved the specification beforehand and on two prior occasions approved awards

---

1. *Standard Engineers and Constructors, Inc. v. EPA*, 483 F.Supp. 1163 (D.Conn.1980); *Passavant Corp. v. EPA, supra; BSP Division of Envirotech v. EPA, supra; CCTW&M v. EPA, supra; Schiavone Construction Co., Inc. v. Samowitz, supra; Darin & Armstrong, Inc. v. EPA, supra; Union Carbide Corp. v. Train*, 73 F.R.D. 620 (S.D.N.Y.1977); *North Construction Company v. Mayo*, 432 F.Supp. 725 (W.D.Mich. 1975); *MacLean Construction Company v. EPA*, 432 F.Supp. 242 (W.D.Mich.1976); *Abert Elia Building Co., Inc. v. Sioux City, Iowa*, 418 F.Supp. 176 (N.D.Iowa 1976); *Lametti & Sons, Inc., v. City of Davenport, Iowa*, 432 F.Supp. 713 (S.D.Iowa 1975); *Grumman Ecosystems Corporation v. Gainsville–Alachua County Regional Electric, Water and Sewer Facilities Board*, 402 F.Supp. 582 (N.D.Fla.1975).

2. *See*, 40 C.F.R. § 35.936–3)"[i]t is the policy of the Environmental Protection Agency to encourage free and open competition."); 33 U.S.C. § 1284(a)(6) and 40 C.F.R. § 35.969–13(a).

containing the anticompetitive specifications.

On the other hand, rejection of all bids whether by the grantee or the EPA is discouraged because it is generally incompatible with the good faith efforts of all parties as well as self–defeating in terms of local water pollution abatement efforts and therefore detrimental to the competitive bidding process. *See* Environmental Protection Agency Program Requirements Memorandum (PRM) 78–8 (February 13, 1978); *Qonaar Corp. v. Metropolitan Atlanta Rapid Transit Authority*, 441 F.Supp. 1168 (N.D.Ga.1977). Thus, in order to insure that EPA–funded construction programs are undertaken in a manner best suited to achieving free and open competition, PRM 78–8 requires a showing of good cause before rejection of bids. Such a demonstration is satisfied when it is determined that there is an ambiguity in bid specifications which cannot be corrected by an addendum to the original invitation for bids and the ambiguity adversely affects competition in violation of the "fundamental principles of procurement necessary to insure free and open competition". PRM 78–8.

### III.

■ Plaintiffs contend, *inter alia*, that the determination of Rochester that PALCO's bid was responsive and that it was a responsible bidder had a rational basis and complied with the regulations.

The defendants counter that because of ambiguities in the bid specifications the bidders competed on unequal footing, thereby jeopardizing the competitive bidding process mandated by the regulations. It concludes that rejection of all bids was necessary in order to preserve the integrity of that process.

It is apparent that the Regional Administrator determined implicitly that the award of the contract in derogation of the policy of free and open competition was not in compliance with subpart E.

The heart of this dispute lies in the interpretation of the MBE specification concerning a bidder's demonstration of positive efforts. Plaintiffs contend that prior EPA determinations in other regions[3] and the Region V EPA's prior approval of the specification at issue here supports their interpretation of the specification. Essentially, plaintiffs PALCO and Rochester interpreted the specification to make positive effort demonstrations entirely a matter of bidder responsibility, with ultimate compliance to be established following opening of the bids.

The EPA challenges this view on the ground that a prior court decision specifically has held the instant specifications to be ambiguous.[4] It further points out that, since the bidders in the case at hand, in good faith and with good reason, interpreted the specification differently, it must be ambiguous. The Regional Administrator specifically found, however, that the specification was intended to make positive efforts demonstrations a matter of bidder responsiveness, not responsibility, and thus not subject to cure following bid opening. He pointed out that if the specification had not been found to be ambiguous, he would have had to reject PALCO's bid only, and the contract would then have had to go to the next lowest responsive, responsible bidder.

The Regional Administrator objects to the specification based upon five alleged

**3.** *Soldotna, Alaska* (EPA Region X, April 25, 1980); *Huntsville, Texas* (EPA Region VI, April 18, 1980); *Johnson County, Kansas* (EPA Region VII, April 1, 1980); *Hastings, Nebraska* (EPA Region VII, March 7, 1980); *Burlingame, California* (EPA Region IX, December 20, 1979); *Midcoastside, California* (EPA Region IX, July 23, 1979); *Skagit County, Washington* (EPA Region X, May 2, 1979); *San Francisco, California* (EPA Region IX, August 9, 1978). These decisions stand for the proposition that

in matters of bidder responsibility, an inadequate demonstration of positive efforts prior to bid opening may be cured at any time before the bid award and that the question of bidder responsibility is a question of fact for the grantee to decide.

**4.** *Jack Leach Construction Co., Inc. v. Village of Kent City*, No. G 79–728 CA 1 (W.D.Mich. February 20, 1980).

ambiguities. He first cites Rochester's failure to cross out the word "suggested" in the heading of the Region V Appendix, "Suggested Specification for MBE Participation". Evidence clearly establishes, however, that the word "suggested" was, in fact, crossed out of the title of the specification included in Rochester's invitation for bids.

The Regional Administrator next objects to the specification's statement that if a bidder properly signed its bid, it was bound to exercise "positive efforts to comply with the MBE policy". The Administrator believes this could be interpreted as only requiring bidders to make a commitment in their bids to the stated goal of MBE participation and the grantee's accepting positive efforts occurring after bid opening as a demonstration of compliance. While such an interpretation might be possible if that particular paragraph were taken out of context, a simple glance at the paragraphs governing evaluation of positive efforts and responsibility determinations indicates that certain documentation of positive efforts was required to be submitted prior to bid opening. The documentation specifically included:

"1. Identification of a specific individual who should be contacted on all MBE matters.

2. Total dollar amount of MBE participation.

3. Proposed percentage of MBE participation vs. the owner's stated goal.

4. Name and address of the MBE contractor(s), contact person(s), type of construction subcontract and dollar amount of subcontract.

(The sample MBE Data Sheet 1 following the policy statement may be used for this purpose.)"

The third claimed ambiguity is found in the paragraph entitled "Evaluating Goal Achievement and/or Positive Efforts," providing that as a prerequisite of demonstrating MBE compliance and goal achievement the bidder should furnish various documentation "with its bid". Here it is claimed that this wording could be interpreted as

requiring positive efforts prior to bid opening. This Court believes the language is clear and does, indeed, require that the enumerated positive efforts demonstration be made prior to bid opening.

The next complaint is that documentation of positive efforts calls for advertisements to be made in minority trade association newsletters no less than fifteen days before MBE responses are due. The Regional Administrator believes that this could be interpreted as requiring responses to be due by either the bid opening date, by the date indicated in the solicitation letter, or just prior to the date by which the subcontract must be submitted. The claimed ambiguity does not exist. Clearly what is required is that bidders submit documentation of any efforts to extend opportunities to MBEs such as advertisements in minority trade association newsletters, etc., within fifteen days of whichever date the bidder indicates to the MBEs they are due. This date could be determined by a number of factors one of which might be the date by which the bidder must submit the subcontract.

Finally, the Regional Administrator found ambiguity simply because some bidders interpreted the specifications requiring positive efforts differently. The Court cannot concur. The specification plainly indicates that a certain specified portion of the demonstration of positive efforts is expected prior to bid opening. The language is unambiguous.

When read together with the other plain language of the specifications, the purported ambiguities are clarified even further.

As to the matter of responsiveness, the specifications state:

"A properly signed bid shall commit the bidder/offeror to exercise positive efforts to comply with the MBE policy to achieve the state goal of MBE participation and accordingly, any such bid shall be deemed, relative to MBE compliance, to be responsive."

The specifications continue:

"To establish a bid as responsible, the bidder/offeror will be obligated to docu-

ment the proposed utilization of MBE subcontractors to achieve the stated goal and/or positive efforts expended to utilize MBE subcontractors."

Thus, it is clear from the specifications that responsiveness is satisfied by acknowledging the commitment to exercise positive efforts to attain MBE goals. It is further clear that the demonstration of positive efforts is a matter of responsibility.

Furthermore, there is no language in the specifications which would lead a bidder to believe that failure to meet the pre–bid opening responsibility requirements could lead to automatic rejection of the bid. Indeed, the section entitled "Sanctions—Responsibility Determination" makes it quite clear that where such failure occurs the grantee "shall request" additional documentation of positive efforts and that failure to then provide the necessary evidence of positive efforts will result in a finding of nonresponsibility.

Couple the unambiguous language of the specifications with the clear import of the prior EPA determinations, *see* note 3, *supra*, and the prior experience of PALCO in bidding on EPA construction grant projects, it is clear that plaintiffs' conclusion that PALCO had met the requirements for both responsiveness and responsibility was reasonable.

The fact that several of the other bidders saw fit, to scrupulously abide by the specifications is, standing alone, not cause for finding that they were ambiguous. The mere fact that specifications may force bidders to use their "informed discretion" in resolving uncertainty about the requirements does not mandate that they be tossed aside. *Copeland Systems, Inc.*, 55 Comp. Gen. 390 (1975).

Furthermore, there is no evidence that the plaintiffs were aware of the decision in *Jack Leach Construction Co., Inc. v. Village of Kent City, supra*, and the EPA's concurrence with that court's determinations regarding the alleged ambiguities in Region V's suggested guidelines and the expansion of the scope of responsiveness requirements.

What the EPA Region V chooses to do regarding implementation of the MBE program in the future is, of course, a decision well within its power. *See Housing Authority of Omaha, Nebraska v. United States Housing Authority*, 468 F.2d 1, 8 (8th Cir. 1972). However, in light of the EPA's failure to sustain its findings here, it may not give retroactive effect to a significant change in the substantive law governing responsibility determinations relating to MBE participation. *See Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1973).

## IV.

Finally, the Court is convinced that the equities of the case overwhelmingly weigh in favor of the plaintiffs.

While bidders on government contracts have no legally enforceable rights absent allegations of fraud, collusion or other gross illegality and are adequately protected by damage actions, *Cincinnati Electronics Corp. v. Kleppe*, 509 F.2d 1080, 1089 (6th Cir. 1975), the concerns of the protesters here are easily outweighed by those of PALCO, VanKnight and Lopez at any rate and do not weigh heavily in the Court's determination.

However, the protection of the integrity of the competitive bidding process, the public interest the EPA seeks to serve by requiring re–letting of bids, must be balanced with the public interest in the cost of delaying the construction of the treatment facility. The costs properly considered include the monetary, social and environmental interests not only of the citizens of Rochester, but all who will be adversely affected by further delay. *Lametti & Sons, Inc. v. City of Davenport, Iowa, supra*, 432 F.Supp. at 715. Since the ambiguity alleged to have jeopardized the competitive bidding process has been found not be exist in the first place, the balancing task is not particularly difficult.

Clearly, plaintiffs must prevail.